UNITED STATES of America,
Plaintiff–Appellee,

v.

Jimmy Lee WILLIAMS, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jimmy Lee WILLIAMS, Defendant–
Appellant.

Nos. 94–5854, 95–5031.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1996.

Decided April 24, 1996.

**ARGUED:** Sema E. Lederman, Raleigh, North Carolina, for Appellant. John Samuel Bowler, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

Before HALL and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge HALL and Judge HAMILTON joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Jimmy Lee Williams appeals his conviction and sentence on forty-seven counts of committing bank fraud in violation of 18 U.S.C. § 1344(1) and aiding and abetting in violation of 18 U.S.C. § 2. He contends that he was denied his right to counsel of his choice, that the testimony of his wife was erroneously admitted at trial, and that the district court applied the wrong Guidelines range at sentencing. Because the district court did not abuse its discretion in disqualifying Williams's chosen counsel and because the admission of Williams's wife's testimony was not plain error, we affirm Williams's convictions. We also find that the district court applied the correct Guidelines range and so affirm Williams's sentence.

I.

Williams wrote forty-seven bad checks and deposited them in the Wachovia Bank account of his then girlfriend, Fannie Martin, between May 6 and July 24, 1990. He endorsed each check by signing Martin's name, deposited the checks by way of automated teller machines, and withdrew money from the account by machine as well. The deposits totaled about $69,000, and the withdrawals totaled a little over $11,000 before Wachovia discovered and halted the scheme.

The FBI began investigating in the summer of 1990, but progress was apparently slow. Martin and Williams married in November of 1991, although the authorities do not seem to have learned of the marriage until long after its occurrence, and only in March of 1992 did the government send Martin a letter informing her that it would seek an indictment against her in the case. She employed a lawyer, Jack Crawley, who represented her while the FBI continued to look for Williams. The government did not find Williams until June, 1993, when he was discovered in local detention awaiting a bond hearing. FBI Agent Brian Warren contacted Williams's then-lawyer and arranged to meet with Williams. On June 4, 1993, immediately before his bond hearing and in the presence of his lawyer, Williams spoke to Agent Warren and confessed in detail to his planning and execution of the entire scheme. He also exculpated Martin, who by then was his wife and had changed her name to Williams. As a result, the government indicted Mr. Williams in November, 1993 but indicated that it would not proceed further against his wife.

In March of 1994, Jack Crawley, the same lawyer who had represented Ms. Williams when she was under investigation, undertook to represent Mr. Williams, who apparently had had at least two other lawyers in this case before that date. A magistrate judge held a pretrial hearing on a government motion to have Crawley disqualified on the grounds that there was a conflict of interest in his representing both Mr. Williams and Ms. Williams, who was expected to be a witness in the case. At that hearing, Crawley said that he no longer represented Ms. Williams, that he would be glad to get another lawyer to do any cross-examination of Ms. Williams that might prove necessary at trial, and that he would not share any information that derived from his representation of Ms. Williams with that auxiliary lawyer. The magistrate judge approved that arrangement.

On the day scheduled for trial, the government renewed its motion to have Crawley disqualified. Notwithstanding the arrangement to bring in auxiliary counsel, the district court granted the motion, finding an obvious conflict of interest between Crawley's former representation of Ms. Williams and his current representation of her husband against whom Ms. Williams was to testify. The court then postponed the trial for three months to allow Williams to get a new lawyer.

Ten days before the rescheduled trial was to begin, Williams filed a motion in limine asserting that he had reason to believe that Ms. Williams would assert a marital-communications privilege and requesting that any such assertion of privilege by her be done out of the presence of and kept from the knowledge of the jury. Three days before the trial date, Ms. Williams sent an "Affidavit" to the district court, declaring her "desire not to be an adverse witness," requesting the protection of any applicable privilege, and requesting that the district court "accept this informal notice to the court as I do not have legal counsel and cannot afford to retain one."

On the day of trial, the government sought to have the question of Ms. Williams's spousal privilege ruled on. It argued that under an established exception to the spousal privilege, spouses might be required to testify to objective facts that had occurred prior to marriage. The district court accepted this argument and gave the government permission to call Ms. Williams for that limited purpose. Mr. Williams did not object to that ruling nor offer counterargument. During the trial, the government called Ms. Williams and elicited testimony that she had not endorsed or deposited the checks herself, nor authorized the signing of or deposit of the checks.

Williams was convicted on all counts. He then filed a pro se motion to set aside the verdict on the grounds of ineffective assistance of his court-appointed lawyer. That motion was denied. He then filed two pro se notices of appeal on November 1 and December 16, although he had not yet been sentenced.

During Williams' sentencing hearing, the district court initially expressed uncertainty about whether Williams's offense level should be 13, as determined by the total amount of loss he had intended to inflict on the bank, or

11, as suggested by Williams, who relied on a complex "attempt" cross-reference in the Guidelines. In the end, the court opted for level 13 but sentenced Williams to the low end of that range, thirty-three months, which, he noted, was also the high end of level 11. The sentencing judge then announced that he would have sentenced Williams to the same thirty-three months even if he had concluded that the proper offense level was 11.

This appeal followed. Williams challenges his conviction on the grounds that he was denied counsel of choice (Crawley) and that the district court erred in requiring Ms. Williams to testify against him despite her assertion of spousal privilege. He challenges his sentence on the grounds that a proper reading of the Guidelines makes his applicable offense level 11 and not 13.

## II.

The general principles to be applied in reviewing a district court's disqualification of counsel are laid out in *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In that case one alleged member of a drug conspiracy had sought to retain a lawyer who had already represented and might again represent two other alleged members of the conspiracy. The government moved to disqualify this lawyer because a conflict of interest might well develop between the lawyer's duties to this defendant and his duties to the other two men. The district court agreed and disqualified counsel, notwithstanding that all three clients had waived their right to conflict-free representation. Upholding the decision to disqualify, the Supreme Court emphasized that the Sixth-Amendment right to counsel has more to do with ensuring the fairness and integrity of the adversarial process generally than with vindicating a defendant's desire to have the particular lawyer that she or he most wants. *Id.* at 159, 108 S.Ct. at 1697. And, the court observed that when a district court detects conflicts of interest, that court must take whatever steps are necessary "to ascertain whether the conflicts warrant separate counsel." *Id.* at 160, 108 S.Ct. at 1697. Moreover, even if one or all defendants pro-

vide explicit waivers of their rights to conflict-free representation and thus declare themselves willing to risk the harm that might come from a hedged cross-examination or a failure to object to admission of a piece of evidence or similar failures of counsel, the court must yet be free to insist on separate representation in order to vindicate its own "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. at 1698.

■ *Wheat* thus requires a district court to exercise its own independent judgment as to whether the proceedings are likely to have the requisite integrity if a particular lawyer is allowed to represent a party. And, it made plain that for this purpose the court must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal either on right-to-counsel grounds if it disqualifies the defendant's chosen lawyer, or on ineffective-assistance grounds if it permits conflict-infected representation of the defendant. *Id.* at 161–64, 108 S.Ct. at 1698–1700.

We have rigorously applied *Wheat*'s rationale—which emphasizes the primacy of the court's concern for integrity of the process—to the point of reversing for abuse of discretion a district court's refusal, because of party waiver, to disqualify even though the conflict was obvious and palpable. *See Hoffman v. Leeke,* 903 F.2d 280, 288 (4th Cir.1990) (disqualification mandated where counsel previously had represented a person who would be the state's "star witness" against the defendant and had, in fact, made the arrangement for the witness to testify).

An Eleventh Circuit case, *United States v. Ross,* 33 F.3d 1507 (11th Cir.1994) is particularly instructive for *Wheat*'s application to the specific kind of conflict presented here. In *Ross,* as in this case, a defendant wished to be represented by counsel who earlier had represented a person who had pled guilty to related charges and who would now be called as the government's witness against the defendant. The *Ross* court upheld the district court's disqualification of this counsel, emphasizing the threat his former representa-

tion necessarily posed to his ability to conduct effective and fair cross-examination of the potential witness. He would face the dual risks of improperly using privileged communications from the previous representation or, by protecting those communications, failing effectively to cross-examine the witness as his present client's interest required. *Id.* at 1523.

■ Under *Wheat* and *Hoffman,* and as is well illustrated by *Ross,* disqualification of Williams's counsel was well within the district court's discretion here. As in *Ross,* Williams desired representation by the same lawyer who had represented a significant potential witness for the government with respect to the same crime. That lawyer would have faced exactly the potential conflict that properly concerned the *Ross* court. Nor could that conflict so surely have been avoided by the device of retaining auxiliary counsel for the special purpose of cross-examining Ms. Williams that abuse occurred by not employing it rather than disqualifying counsel. Significant, unavoidable risks would have remained. After all, Crawley would remain at counsel table and likely be the auxiliary lawyer's chief source of information about the case. And at the time Crawley was disqualified, arrangement for auxiliary counsel had not, in any event, been made. While allowing such a procedure might have been within the court's discretion, declining to use it cannot be held an abuse of that discretion. *Cf. United States v. O'Malley,* 786 F.2d 786, 789–92 (7th Cir.1986) (holding that a conflict of interest arising from a defendant's lawyer's former representation of a witness might be cured by such devices as limitation of cross-examination to matters already within the public record but that preference for such a cure over disqualification was within the discretion of the trial judge).

### III.

Williams next claims that the district court erred in admitting the testimony of his wife after she attempted to assert her spousal privilege not to testify against him. The government contends that this issue is not properly presented because Williams failed to object to her testimony at trial. Williams counters that his motion in limine to require that any assertion by Ms. Williams of testimonial privilege at trial be made and ruled upon outside the jury's presence sufficed to preserve the issue.

■ We agree with Williams on the general question of the effect of motions in limine, but disagree with his contention that his sufficed to preserve the issue he seeks to raise in this case. As a general rule, motions in limine may serve to preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it. *See generally* 21 Charles Alan Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037, at 195 (1977) ("If a ruling is made at the pretrial stage, it is 'timely' and there is no need to renew the objection at trial."); *United States v. Mejia–Alarcon,* 995 F.2d 982, 986 (10th Cir.1993) ("[A] motion in limine may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge."); *but see, United States v. Graves,* 5 F.3d 1546, 1552 & n. 6 (5th Cir. 1993), (*contra:* but with acknowledgment that rule is otherwise in most circuits).

■ That said, we nevertheless conclude that Williams's motion in limine here was inadequate to preserve the specific issue he wants preserved—for two reasons. First, the motion in limine was not based upon nor did it seek a ruling on the precise issue Williams now seeks to raise—whether Ms. Williams's invocation at trial of spousal privilege entitled him to exclusion of her testimony. His motion sought only a ruling that if she asserted such a privilege,[1] it should be heard and determined outside the jury's

---

**1.** His motion actually identified assertion of a marital-communications privilege, not the broader spousal privilege. This might be a further infirmity in the motion's adequacy to preserve

the broader issue, but we need not address that possibility in view of our disposition on other grounds.

presence. Second, the district court never ruled on the motion in limine as made by Williams. The court did of course, ultimately make a ruling, at the government's request, against Ms. Williams's later assertion at trial of spousal privilege. But Williams had not requested a ruling on that assertion and did not then object to the ruling made. Under these circumstances, we conclude that any error that may have occurred in denying Ms. Williams's assertion of spousal privilege has been procedurally defaulted by Williams, so that we may only review the ruling for plain error.

Under the Supreme Court's interpretation of Fed.R.Crim.P. 52(b) in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we have authority to correct forfeited error only if it is "plain" in the sense of being obvious, and if a defendant has shown, the burden being upon him, that the error affected his "substantial rights." *Olano,* 507 U.S. at 732–36, 113 S.Ct. at 1777–78. And even then we have discretion to decline to correct the error unless we conclude that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736, 113 S.Ct. at 1779 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)) (internal quotation marks omitted).

Here, even if we assume *arguendo* that the district court erred in denying Ms. Williams the spousal privilege and that that error was sufficiently clear to satisfy the first two parts of plain-error analysis, we conclude that Williams has not shown that the error affected his "substantial rights." On that basis, we have no authority to correct any error that may have occurred, and need not reach the further question whether it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."

To show that admission of his spouse's testimony affected his "substantial rights," Williams must persuade us that it caused him actual prejudice, in the sense that it "affected the outcome of the district court proceedings." *Id.* at 734, 113 S.Ct. at 1777.[2] We are not so persuaded.

Under *Olano,* the question whether a forfeited plain error was actually prejudicial is essentially the same as the question whether nonforfeited error was harmless— the difference being only in the party who has the burden on appeal to show the error's effect. *Id.* at 734–36, 113 S.Ct. at 1778. Hence, in considering whether Williams has shown actual prejudice from the admission of his wife's testimony, we apply the obverse of the harmless error test as expressed in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See Olano,* 507 U.S. at 734–36, 113 S.Ct. at 1778 (harmless error test of *Kotteakos* equivalent to actual prejudice test of plain error under Rule 52(b)). Under that test, our question is whether Williams has shown that "without stripping the erroneous action from the whole," i.e. without simply disregarding Ms. Williams's testimony, we can say, taking everything into account, that it "substantially swayed" the jury's verdict. *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48. In making that inquiry, we must consider the whole record, *United States v. Adam,* 70 F.3d 776, 780 (4th Cir.1995), and in doing so, we may take into account the closeness of the case as a whole, the centrality of the issue affected by the error claimed, and any steps taken by the trial court to mitigate its effect. *United States v. Nyman,* 649 F.2d 208, 212 (4th Cir.1980).

Though the issue affected by admission of Ms. Williams's testimony—whether she, not Williams, had endorsed her name on the checks—was obviously central to the case, the dispositive consider action is that, on the whole record, the case simply was not that close. The heart of the charge against Williams was that he wrote forty-seven bad checks on three closed accounts in three banks, endorsing each check by forging Ms. Williams's then name as payee for deposit

---

2. *Olano* reserved the questions whether in some cases where actual prejudice was not or could not be shown, it might be presumed, and whether there were other cases in which substantial rights might be affected independent of any actu-

al or presumed prejudice. *Olano,* 507 U.S. at 734–36, 113 S.Ct. at 1778. There is no suggestion here that this case falls in either of such possible categories, hence Williams's burden is to show actual prejudice as defined in *Olano.*

into her account. The forgery was evidenced by undisputed exemplars of Williams's handwriting. More critically, there was undisputed evidence that Williams, in his lawyer's presence, had confessed the crime charged in some detail to FBI agent Warren. Though Ms. Williams's testimony that she had neither endorsed the bad checks nor authorized the endorsement obviously improved the Government's case, we are not persuaded that "it substantially swayed" the jury's verdict.

Because even if plain though forfeited error occurred in the admission of this testimony Williams has not shown actual prejudice from its admission, we have no authority under Rule 52(b) to correct any error that did occur.

## IV.

Finally, Williams challenges his sentence on the grounds that the district court calculated his offense level incorrectly.

## A.

■ Preliminarily, we must consider the government's claim that Williams's prematurity in filing his notice of appeal deprives us of appellate jurisdiction over the sentencing issue. We disagree.

Williams filed two notices of appeal. Both were filed pro se after his conviction but before his sentencing. Neither, therefore, explicitly designated his sentence as a subject of his appeal, see Fed. R.App. P. 4(b), though each otherwise complied with the content requirements of the Rule. The Government cites no specific authority for its position that the prematurity of these appeal notices deprives us of appellate jurisdiction, relying only on the general indisputable proposition that *timely* filing is jurisdictional. The general rule in the circuits, however, is that under a proper construction of Rule 4(b), a notice of appeal filed after the date of conviction but before sentencing is effective to support jurisdiction over an appeal from the final judgment, which of course includes the sentence, just so long as the Government is not prejudiced by the prematurity. *See United States v. Winn,* 948 F.2d 145, 152–56

(5th Cir.1991); *United States v. Cortes,* 895 F.2d 1245, 1247 (9th Cir.1990); *United States v. Walker,* 915 F.2d 1463, 1465 (10th Cir. 1990); *United States v. Hashagen,* 816 F.2d 899, 905–06 (3d Cir.1987); *United States v. Curry,* 760 F.2d 1079, 1079–80 (11th Cir. 1985); *United States v. Moore,* 616 F.2d 1030, 1031–32 (7th Cir.1980). We agree with that position and since the government has not suggested that it has suffered any prejudice, we find Williams's notices of appeal effective to support our jurisdiction over the sentencing issue he raises.

## B.

On the merits, Williams claims that for sentencing purposes he did not complete the "fraud" of which he was convicted since he only withdrew about $11,000 of the $69,000 that he deposited in the bank. Consequently, he contends that he was entitled to but denied the benefit of a cross-reference in the guideline for fraud, 2F1.1, that should have led the sentencing court to the attempt guideline, 2X1.1, which deals with the special case of "a partially completed offense (*e.g.,* an offense involving a completed fraud that is part of a larger, attempted fraud)...." U.S.S.G. 2F1.1 App. Note 9. We need not get into the complexities of how resort to that cross-reference might reduce Williams's sentence, however, because Williams cannot show the predicate for its use: that his offense did involve a partially completed fraud within a larger, attempted fraud.

Williams relies on *United States v. Mancuso,* 42 F.3d 836 (4th Cir.1994), for the proposition that where an ultimately intended loss exceeds the actual sustained loss by a considerable amount, this necessarily is a case of a smaller, completed fraud within a larger uncompleted fraud that would invoke the cross-reference to 2X1.1. This fails, however, to grasp the distinction between completing a fraud, on the one hand, and inflicting all the loss that one intended to inflict by means of that fraud, on the other. *See United States v. Strozier,* 981 F.2d 281, 286 (7th Cir.1992). Williams's position would treat the $11,000 he withdrew from the bank as the "actual" loss attributable to his "completed" fraud and the $69,000 as merely the "intended" loss attrib-

utable, by definition, to an "uncompleted" fraud.[3] But, as the district court held, an "intended" loss that the defendant failed fully to inflict may nevertheless be attributable to a "completed" fraud. *Mancuso* does not hold, as Williams contends, that a loss that is merely "intended" rather than "actual" necessarily is a loss attributable to an uncompleted fraud rather than to a completed fraud. Not only is it clear as a general matter that a fraud can be complete without ultimately inflicting the full, intended loss on the victim—Williams's scheme is a good case in point—but *Mancuso* is entirely consistent with that general proposition. While that case did involve a smaller, completed fraud within a larger attempted fraud, that was not because there was an intended loss that was much greater than the actual loss. Rather, it was because the district court had found as relevant conduct an uncompleted fraud that was much larger than the smaller fraud of which the Mancusos were specifically convicted. Specifically, the Mancusos had been convicted of diverting to themselves several hundred thousand dollars in professional fees that should have been paid jointly to them and their bank, but the district judge found that they would have continued to divert hundreds of thousands of dollars more up to a total of about $800,000 if they had not been caught first. These further diversions were never completed, although there was ample evidence that the Mancusos had intended to carry them out. Thus the court of appeals, applying the Guidelines to the district judge's factual findings, found a large, uncompleted fraud with an intended loss of about $800,000 *and* within that larger fraud a smaller, completed fraud (comprised of the specific offenses of conviction) with a substantially smaller loss. It was on that basis that the *Mancuso* court found the cross-reference to the attempt guideline triggered. *Mancuso*, 42 F.3d at 848–50.

 Williams's case is critically different. Unlike the *Mancuso* situation the $69,000 "intended" loss on the basis of which he was sentenced was not attributable to an uncompleted, but to a completed fraud. That ap-

pears from an analysis of the nature of his offense of conviction. Williams was charged with and convicted of fraud in the acts of depositing worthless checks in the total amount of $69,000, and not in the acts of withdrawing funds from the accounts thus fraudulently created in the total amount of $11,000.

 Under 18 U.S.C. § 1344, and as he was specifically charged, Williams had completed the offense of bank fraud as soon as he fraudulently obtained credit from Wachovia in the form of a balance in a bank account. *See e.g., United States v. Hord*, 6 F.3d 276, 281 (5th Cir.1993) (bank fraud indictment that charged withdrawals as well as the deposits was multiplicitous since "[i]t is the deposits, not [the] withdrawal attempts, that constitute executions of the scheme"); *United States v. Strozier*, 981 F.2d 281, 286 (7th Cir.1992) ("The defendant completed his defrauding of [the bank] when he set up the two fraudulent accounts; what he did not get around to completing was inflicting on [the bank] *all* the loss his actions clearly indicate he planned.").

In sum, while the $11,000 *actual* loss was, as all agree, attributable to the completed fraud, so too was the $69,000 *intended* loss that Williams proved unable actually to inflict before he was stopped. Under the Guidelines, a fraud "loss" for sentencing purposes includes not just actual loss but intended loss whenever the latter can be determined. See U.S.S.G. 2F1.1 App. Note 7. Where that intended loss is attributable only to an uncompleted fraud rather than to the completed fraud, then 2F1.1's cross-reference to the attempt guideline kicks in, see 2F1.1 App. Note 9, but where as here it is attributable to a completed fraud, that cross-reference is inapplicable. The district court did not, therefore, err in declining to impose sentence by specific reference to the attempt Guideline.

*AFFIRMED.*

---

**3.** The parties agree that the $69,000 is an accurate measure of the intended loss, so we accept the fact without necessarily agreeing.