**UNITED STATES of America, Appellee,**

v.

**Robert Anthony STUDEVENT, Appellant.**

No. 96–3095.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 5, 1997.

Decided July 8, 1997.

L. Barrett Boss, Assistant Federal Public Defender, argued the cause for the appellant. A.J. Kramer, Federal Public Defender, Washington, DC, and Frances H. Pratt, Attorney, Alexandria, VA, were on brief.

Jeanne M. Hauch, Assistant United States Attorney, Washington, DC, argued the cause for the appellee. Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black and Harry R. Benner, Assistant United States Attorneys, Washington, DC, were on brief.

Before WALD, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Opinion concurring in part and dissenting in part filed by Circuit Judge TATEL.

KAREN LECRAFT HENDERSON, Circuit Judge:

Robert A. Studevent (Studevent) appeals his 18–month sentence for bank fraud. He argues principally that the district court should have limited the "intended loss" attributed to his theft and forgery of checks under application note 7 to section 2F1.1 of the United States Sentencing Guidelines (U.S.S.G. or Guidelines) to an amount that was realistic or at least possible. In his view, the fact that he was enmeshed in a government sting and thus could have caused no

actual loss should limit the amount of intended loss attributed to his crime. Studevent argues in the alternative that the district court misunderstood its authority to depart downward pursuant to application note 10 to section 2F1.1. We reject both assignments of error and affirm Studevent's sentence.

## I. FACTS

In January 1995, Studevent gave Anthony Wallace, his employer at the time, a blank check he had stolen from a former employer. Wallace made out the stolen check for $28,-759.97 and deposited it in his company's account. Studevent received $3,110.95 from the proceeds. As a result of that crime, a Federal Bureau of Investigation (FBI) agent operating under the name "Bob Vieta" contacted Studevent through an acquaintance and offered to fence any further stolen checks Studevent could obtain.

Studevent did steal a number of additional checks. Studevent met with his FBI fence five times between April and July 1995 and sold him eleven stolen checks. The FBI agent told Studevent to whom to make out the checks and gave him a ballpark figure for the amount of each check. Studevent decided the actual amounts and signed the checks. Including the one given to Wallace, the checks were made out for a total of $535,-592.35. Studevent received $5,700 from the FBI agent for the eleven checks.

Studevent was arrested on July 6, 1995 and charged with one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2, five counts of bank fraud in violation of 18 U.S.C. § 1344, eleven counts of possession of a forged security in violation of 18 U.S.C. § 513(a) and one count of obstruction of correspondence in violation of 18 U.S.C. § 1702. On December 6, 1995, Studevent pleaded guilty to a single violation of 18 U.S.C. § 1344. After the government and Studevent filed sentencing memoranda, the district court attributed an intended loss of $535,-592.35 to Studevent's fraud and sentenced him to 18 months' imprisonment, the bottom of the applicable Guidelines range. *United*

*States v. Studevent,* Criminal Case No. 95–0175, Memorandum and Order at 2–4 (D.D.C. May 30, 1996) (Memorandum and Order), *reprinted at* Appellant's App. 139–41; Appellant's App. 146. The court declined to depart downward on the ground that the intended loss overstated the seriousness of the crime. Memorandum and Order at 4, *reprinted at* Appellant's App. 141.

## II. DISCUSSION

### A. Calculation of Loss

■ Guidelines section 2F1.1, which governs sentencing for various forms of fraud, ties a defendant's sentence to the amount of loss caused by his fraud. Application note 7 to the section explains that, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1 application n.7. Studevent argues that intended loss should be limited to the loss that he realistically could have caused. Under his theory, the district court's loss calculation should not have included the checks he passed to the FBI agent because there was no possibility that those checks would be deposited and their rightful possessors defrauded and because there was no evidence that the accounts on which the checks were drawn were open and contained sufficient funds. We disagree.

Studevent relies principally on the Tenth Circuit's decision in *United States v. Galbraith,* 20 F.3d 1054 (10th Cir.), *cert. denied,* 513 U.S. 889, 115 S.Ct. 233, 130 L.Ed.2d 157 (1994). In *Galbraith,* the Tenth Circuit held that "the loss [the] defendant subjectively intended to cause is not controlling if he was incapable of inflicting that loss" and accordingly concluded that the appropriate amount of loss to attribute to a defendant caught in a sting operation is zero. *Id.* at 1059; *see also United States v. Santiago,* 977 F.2d 517, 526 (10th Cir.1992). The Sixth Circuit has adopted the same position, holding that "intended loss must have been possible to be deemed relevant." [1] *United States v. Wat-*

---

1. In addition, the Fourth Circuit affirmed a district court's use of "economic reality" to limit the loss calculation for a fraud sentence. *United*

*States v. Dozie,* 27 F.3d 95, 99 (4th Cir.1994). The decision in *Dozie,* however, rested on application note 7's former reference to "probable or

kins, 994 F.2d 1192, 1196 (6th Cir.1993); see also United States v. Khan, 969 F.2d 218, 221 (6th Cir.1992). The Fifth, Seventh and Ninth Circuits, on the other hand, have decided that a defendant need not have been capable of inflicting the intended loss under Guidelines section 2F1.1.[2] United States v. Ismoila, 100 F.3d 380, 396 (5th Cir.1996) ("The fact that the victims were not at risk for the charges above their credit limit is not dispositive."); United States v. Coffman, 94 F.3d 330, 336 (7th Cir.1996) (rejecting argument "that a loss that cannot possibly occur cannot be intended"), cert. denied, —— U.S. ——, ——, 117 S.Ct. 1425, 1426, 137 L.Ed.2d 535 (1997); United States v. Koenig, 952 F.2d 267, 271–72 (9th Cir.1991) ("[S]ection 2F1.1 only requires a calculation of 'intended loss' and does not require a finding that the intentions were realistic."). We agree with the Fifth, Seventh and Ninth Circuits on the issue.

As an initial matter—and most importantly—application note 7 does not qualify "intended loss" in any way. See Ismoila, 100 F.3d at 396 ("plain language of comment 7 makes clear" that "intent is critical" regardless of likelihood of success); United States v. Robinson, 94 F.3d 1325, 1328 (9th Cir. 1996) (under "plain meaning reading" of application note 7, nothing "mandates that the defendant be capable of inflicting the loss he intends"). Application note 7 does state that intended loss should be used "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy)" and section 2X1.1 calls for a three-point reduction in offense level if the offense was not completed. Section 2X1.1 does not suggest, however, that

intended loss should be limited by economic reality. Instead, section 2X1.1(a) refers to "any intended offense conduct" without qualification and application notes 2 and 4 to section 2X1.1 indicate that a defendant should be sentenced based on what he intended even if he did not succeed, if his intent can be determined with specificity and if the offense level for his intended conduct minus three points is greater than for his actual conduct.

The United States Sentencing Commission (Commission) currently is considering whether to add language to application note 7 regarding impossibility or economic reality. Sentencing Guidelines for United States Courts, 62 Fed.Reg. 152, 173 (1997) ("[T]he Commission invites comment on whether intended loss should be limited by concepts of 'economic reality' or impossibility, such as in a government sting operation. . . ."). Unless and until it does so, however, the application note should be applied as written. See United States v. Smaw, 22 F.3d 330, 333 (D.C.Cir. 1994) ("We owe the Sentencing Commission's commentary on its own guidelines the same treatment as we afford 'an agency's interpretation of its own legislative rules.' " (quoting Stinson v. United States, 508 U.S. 36, 44, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993))). We therefore decline to graft an impossibility or improbability limitation onto the Commission's intended loss provision.

Application note 10 to section 2F1.1 bolsters our reading of the plain language of application note 7. Note 10 authorizes a downward departure "where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would

intended loss." Id.; see also United States v. Holiusa, 13 F.3d 1043, 1045–46 (7th Cir.1994) (discussing significance of "probable or intended loss" language). The term "probable" was deleted effective November 1, 1991. U.S.S.G.App. C, amend. 393.

2. The government asserts that the First, Second and Fourth Circuits also adopted this position in United States v. Haggert, 980 F.2d 8 (1st Cir. 1992), United States v. Agwu, 5 F.3d 614 (2d Cir.1993), and United States v. Williams, 81 F.3d 1321 (4th Cir.1996), respectively. Haggert, however, addresses the separate question whether a sight draft is a loan application and thus comes within the exception under which actual rather

than intended loss is used to calculate the sentence for a fraudulent loan application. Haggert, 980 F.2d at 12–13. Agwu discusses the mechanics of the loss calculation for stolen money orders on which no amounts are filled out and whether economic gain is the proper measure of loss. Agwu, 5 F.3d at 615. Williams focuses on whether the fraud at issue was completed and thus whether the cross-reference to section 2X1.1 contained in application note 9 to section 2F1.1 applied. Williams, 81 F.3d at 1327–28. None of the three cases addresses whether intended loss should be limited by impossibility or improbability and the government identifies no other cases on point from those circuits.

seriously consider honoring it." U.S.S.G. § 2F1.1 application n.10. It would be unnecessary to authorize such a departure if the unlikelihood of success already limited the intended loss attributable to a defendant under application note 7. *See Coffman,* 94 F.3d at 336 (application note 10 "implies that the unlikelihood of an actual loss does not affect the computation of the 'intended loss' ").

Our reading also accords with the general scheme of the Guidelines. One of the Guidelines' goals is to tailor punishment to a defendant's particular degree of culpability. *See* U.S.S.G. subpart 1A3 ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."). Limiting intended loss to that which was likely or possible, however, would eliminate the distinction between a defendant whose only ambition was to make some pocket change and one who plotted a million-dollar fraud. *See Coffman,* 94 F.3d at 336 (argument that intended loss is limited by impossibility "would, if accepted, irrationally erase any distinction in the severity of punishment between a defendant who tries to defraud his victim of $1,000 and a defendant who tries to defraud his victim of $1,000,-000"). We recognize that in some cases intended loss may drastically overstate the gravity of an offense. The Guidelines, however, already provide for that event: a sentencing court has the discretion to depart downward if it determines intended loss overrepresents culpability. *See* U.S.S.G. § 2F1.1 application n.10. Rather than, as Studevent proposes, sentencing for an intended loss of zero and departing upward on the ground of underrepresentation, it is more in keeping with section 2F1.1's design to sentence for the full amount of the intended loss and depart downward. *See Coffman,* 94 F.3d at 336–37 ("[T]he place for mitigation on the basis of a large discrepancy between intended and probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss.").

■ Studevent nevertheless urges us to conclude that a government sting is a special case in which, although actual loss is not possible, law enforcement officials can lure the target into committing himself to vast amounts of intended loss. His proposal to limit the use of intended loss in cases involving stings, however, finds no support in the Guidelines. With no language in the Guidelines to support a sting exception, we are guided by the principle that, "in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties." *United States v. Mezzanatto,* 513 U.S. 196, 210, 115 S.Ct. 797, 806, 130 L.Ed.2d 697 (1995) (alteration in original) (quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). In that regard, Studevent's description of the potential abuses of a sting seems particularly unconvincing given that he began to engage in check fraud before the government arrived on the scene and continued to play a significant role, including deciding the amount of each fraudulent check, after the sting was underway.

Studevent goes on to argue that the Guidelines in general and the theft and fraud sections in particular focus on actual loss. It is less than clear, however, that actual loss is a dominant principle of the Guidelines. The Guidelines are replete, for example, with provisions focusing on intent and mental culpability. *See, e.g.,* U.S.S.G. § 2A1.1 application n.1 ("If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted."); *id.* § 5K2.13 (authorizing downward departure on ground of "significantly reduced mental capacity"). In any event, the Guidelines-wide significance of actual loss is irrelevant. Studevent does not contest that application note 7 to section 2F1.1 makes intended loss the pertinent figure.

■ We therefore conclude that intended loss under application note 7 to Guidelines section 2F1.1 is not limited to an amount that was possible or likely.[3] Accordingly, the dis-

---

**3.** Although we decide as a matter of law that intended loss is not limited by impossibility or improbability, we note that even if we agreed with the *Galbraith* court's view of the law we would reach the same result. The victim in *Galbraith*—a pension fund to which overvalued

trict court did not err when it ascribed to Studevent the full amount of the intended loss even though he was involved in a government sting. The district court also properly held Studevent responsible for the total amount for which the checks were written despite the absence of evidence that the victims' accounts were open and contained sufficient funds.[4] Although intended loss may not always be easy to calculate, here the defendant memorialized the amount of intended loss in writing to the penny and he may not benefit from the likelihood that his ability to inflict that loss was slim to nonexistent.

## B. Other Issues

Studevent contends that the district court should have considered whether to grant him the three-point downward adjustment under Guidelines section 2X1.1 for uncompleted attempts. Section 2X1.1(b)(1) provides for a three-point decrease for an attempt "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." Studevent asserts for the first time on appeal that he was entitled to the adjustment. By not raising it below, he waived the point and we review only for plain error. *See United States v. Foster*, 988 F.2d 206, 209 (D.C.Cir.), *cert. denied*, 508 U.S. 945, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993).

The district court did not plainly err, if it erred at all, in not granting Studevent the downward adjustment *sua sponte*. The adjustment does not apply if "the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." U.S.S.G. § 2X1.1(b)(1). In this case, Studevent stole the checks, filled them out and turned them over to the person he believed was a fence. By so doing, he completed all of the acts he thought he had to in order to complete the offense. Moreover, Studevent pleaded guilty to fraud, not to attempted fraud. It thus is not "more than obvious or readily apparent," *United States v. Young*, 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985), that Studevent was entitled to the adjustment.

Finally, Studevent argues that the district court misunderstood its authority to grant him a downward departure under application note 10 to Guidelines section 2F1.1. That note states in relevant part that "[i]n a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense" and that "[i]n such cases, a downward departure may be warranted." U.S.S.G. § 2F1.1 application n.10. While a sentencing court's "discretionary decision that the particular circumstances of a given case do not warrant a departure" is unreviewable, a refusal to depart is reviewable "if it rests on a 'misconstruction of [the court's] authority to depart.'"[5] *United States v.*

---

stock was to be sold—was a Potemkin institution fabricated by law enforcement officials. Galbraith thus never could have defrauded anyone. Studevent, on the other hand, stole checks from real entities and thus had real potential victims who could have been defrauded but for the intervention of the FBI. Accordingly, we would affirm Studevent's sentence even if *Galbraith* were correct as a matter of law. *See Coffman*, 94 F.3d at 337 ("But even if ... [*Galbraith* and similar cases] were decided correctly, they would not carry the day for defendants."); *United States v. Falcioni*, 45 F.3d 24, 27 (2d Cir.1995) (distinguishing *Galbraith* on ground that Falcioni's intended victim actually existed); *see also United States v. Sheets*, 65 F.3d 752, 753–54 (8th Cir. 1995) (distinguishing *Watkins*, 994 F.2d at 1196, on ground that Sheets had actual victim and took all steps necessary for fraud to succeed).

4. Even if the status of the accounts (all of which were in the names of business entities) were relevant, there is nothing impossible or even improbable about their being open and containing adequate funds. Although the checks were facially *bona fide* and drawn on financial institutions of uncontested liquidity, to satisfy Studevent the government presumably would have to introduce evidence that, among other things, the accounts contained at least the amount of funds for which each check was written on or after the date on which it was written. We decline to impose such a burden on the government.

5. We reject the government's contention that Studevent's failure to object to and seek clarification of the district court's ruling on his downward departure request means that the issue is not properly before us. It is the defendant's duty to elicit the district court's reasons for refusing to grant a downward departure and, in the absence of any indication of the court's actual decision process, we will assume that the court reached its decision for the right reasons. *United States*

*Pinnick,* 47 F.3d 434, 439 (D.C.Cir.1995) (quoting *United States v. Lopez,* 938 F.2d 1293, 1296 (D.C.Cir.1991)).

In Studevent's view, the district court mistakenly believed it could not grant the downward departure under application note 10 unless it could ascribe to him an amount of loss lower than the $535,592.35 in intended loss. In support of his position, he observes that the court commented that "the $535,000 figure does somewhat overstate the seriousness of Studevent's crimes" but then stated "[n]evertheless, there is no rational number to put on the loss other than the sum of the checks themselves." Memorandum and Order at 4, *reprinted at* Appellant's App. 141. Taken in context, however, the latter statement indicates not that the court misunderstood its authority but that it rejected Studevent's rationale for his request. Studevent based his request first and foremost on the ground that "it was the undercover agent who controlled Mr. Studevent's sentencing exposure by determining the amount of each check and the duration of the investigation." Defendant's Sentencing Memorandum at 5, *United States v. Studevent,* Criminal Case No. 95–0175 (D.D.C.1996), *reprinted at* Appellant's App. 50. Thus, when it observed that there was no rational number for the losses other than the amount for which the checks were written, the court was simply responding to the factual argument Studevent had advanced in support of his request. To drive that point home, the court went on to observe that "[t]he investigation clearly was directed not only at gathering evidence against Studevent but also at discovering others who might have been involved" and was not unreasonably prolonged. Memorandum and Order at 4, *reprinted at* Appellant's App. 141. Accordingly, we conclude that the district court was aware of the nature of its authority to depart but found Studevent's request for the departure less than compelling.

For the foregoing reasons, Studevent's sentence is

*Affirmed.*

v. *Pinnick,* 47 F.3d 434, 439 (D.C.Cir.1995) ("[T]he appellant, not us, has the initial responsibility to ensure that the district court explains its reasoning for the record."). In this case, howev-

Tatel, Circuit Judge, concurring in part and dissenting in part:

I agree that the district court properly increased Studevent's offense level under subsection 2F1.1(b)(1) of the Guidelines to reflect intended loss. Because I believe the district court may have " 'misconstru[ed] ... its authority to depart,' " *United States v. Pinnick,* 47 F.3d 434, 439 (D.C.Cir.1995) (quoting *United States v. Lopez,* 938 F.2d 1293, 1296 (D.C.Cir.1991)), under application note 10 of section 2F1.1, however, I would remand for reconsideration of Studevent's request for a downward departure.

The district court found that its $535,592 loss determination "somewhat overstate[d] the seriousness of Studevent's crimes" but denied the departure request, at least in part, because "[n]evertheless, there [was] no rational number to put on the loss other than the sum of the checks themselves." *United States v. Studevent,* Crim. No. 95–0175, Memorandum and Order at 4 (D.D.C. May 30, 1996), *reprinted in* Appellant's App. 139–41. Unlike my colleagues, I doubt that the latter statement simply reflects the district court's rejection of Studevent's sentencing entrapment claim. In my view, it suggests instead that the district court may have believed that a downward departure under note 10 required an alternative loss figure. Having already determined that the loss under subsection (b)(1) overstated the seriousness of the offense, however, the question for the district court was whether Studevent's offense level warranted reduction to rectify the concededly imperfect fit between the loss calculation and his degree of culpability, *not* whether another dollar figure better described the loss.

The record suggests that the district court might have answered the correct question had it not felt limited by its inability to calculate an alternative loss figure. Reaching the correct result on the intended loss issue, the district court nevertheless ap-

er, the memorandum opinion states the district court's rationale for not granting a downward departure. *Pinnick* does not require Studevent to pester the court to regurgitate its rationale.

peared troubled by its implications for Studevent. At a presentencing hearing, the district judge asked defense counsel to "give [him] a vehicle" to distinguish the Government's authorities, stating, "I am not disinclined to what it is that you're proposing, . . . I will take all the help that you can give me." Tr. (Apr. 3, 1996) at 5. After being "[f]orced to choose" between the views of our sister circuits, Memorandum and Order at 3, *reprinted in* Appellant's App. 140, not only did the district court find that Studevent's intended losses "somewhat overstated" the gravity of his offense, but it also listed several factors which it apparently thought might warrant a departure, including the modest sum Studevent actually gained from his crimes. *See Id.* at 4, *reprinted in* Appellant's App. 141. Although I am not sure whether all the district court's concerns could serve as the basis for a note 10 departure, the great disparity between the intended and probable losses in this case certainly could. Especially because our ruling on the intended loss issue relies heavily on the analysis in *United States v. Coffman,* 94 F.3d 330 (7th Cir.1996)—a case undecided when the district court considered Studevent's request—I would give the district court, freed from the need to calculate an alternative loss figure, an opportunity to reconsider whether Studevent's case warrants a departure.