F I L E D
United States Court of Appeals
Tenth Circuit

APR 19 1999

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

vs.

WARREN ELVIN ENSMINGER,

    Defendant-Appellant.

No. 98-6179

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-97-193-C)

Paul Antonio Lacy, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Hank Hockeimer, Jr., Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **ANDERSON**, **KELLY**, and **BRISCOE**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant Warren Elvin Ensminger appeals his eighteen-month sentence

and conditions of probation for violation of 18 U.S.C. § 1001 (false statements).

The district court adopted the offense level calculation contained in the presentence report under USSG § 2F1.1 (1997), which governs offenses involving fraud and deceit, including a ten-level enhancement for an intended loss of $540,700 and a two-level enhancement for more than minimal planning. In addition, the district court imposed several conditions of probation, including the monitoring of Mr. Ensminger's financial dealings. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse in part and affirm in part.

Background

Since Mr. Ensminger's appeal only deals with the propriety of his sentence and probation conditions, we briefly set out the factual background of this case. Mr. Ensminger was indicted on three counts. Counts one and two charged him with a scheme to obtain an ownership interest in certain real property through submitting bogus financial instruments in violation of 18 U.S.C. §§ 2 and 1341. Mr. Ensminger allegedly purchased at least six false money orders and mailed two of them to different banks, in order to pay off outstanding promissory notes executed by his mother. Count three charged him with presenting a document to the U.S. Marshal's Office which falsely indicated that he had prevailed in a civil action against the Farm Credit Bank of Wichita, Kansas, when in fact, Mr. Ensminger knew that the action had been dismissed. This document, which Mr.

Ensminger entitled "Special Execution and Order of Assistance for Possession," also indicated that the lawsuit entitled him to possession of certain real properties located in Major County, Oklahoma. Mr. Ensminger pled guilty to count three in exchange for the dismissal of counts one and two.

Mr. Ensminger filed several objections to the presentence report, and the district court heard argument on these objections at the sentencing hearing on April 8, 1998. Mr. Ensminger contended that the amount of intended loss should not be calculated at the full value of the properties in question ($540,700), but rather on the one-ninth interest Mr. Ensminger would have received as a beneficiary of his mother's estate had his scheme been successful. Alternatively, Mr. Ensminger argued that there was no possibility of his scheme being successful, and thus that the amount of intended loss should be zero. He further argued that a more than minimal planning enhancement should not be applied to his case. The district court rejected his arguments and sentenced Mr. Ensminger to eighteen months imprisonment and two years of supervised release.

Mr. Ensminger appeals, contending that the district court erred in (1) enhancing his offense level based on an intended loss of $540,700; (2) enhancing his offense level based on a finding of more than minimal planning; and (3) imposing special conditions of supervised release relating to financial disclosures and restrictions.

Discussion

On appeal, "[w]e review the district court's legal interpretation of the guidelines de novo, and review its findings of fact for clear error, giving due deference to the district court's application of the guidelines to the facts." United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998) (citations omitted).

## A. Amount of Intended Loss

The district court sentenced Mr. Ensminger based on the uncontested value of the properties, $540,700, that he attempted to have the U.S. Marshal seize. Mr. Ensminger argues that the district court erred in sentencing him based upon an intended loss of greater than $500,000, see USSG § 2F1.1(b)(1)(K), because there was no possibility of loss occurring as a result of his "Special Execution and Order of Assistance for Possession." He asserts that he was "incapable of causing loss because of governmental control over the civil execution process and judicial intervention." Aplt. Brief at 14.

Mr. Ensminger relies upon our decisions in United States v. Galbraith, 20 F.3d 1054 (10th Cir. 1994), and United States v. Santiago, 977 F.2d 517 (10th Cir. 1992). In Galbraith, the defendant argued that "because his offense was committed in response to an undercover sting operation structured so there was no possibility of loss to a victim, the intended or probable loss was zero." Galbraith,

20 F.3d at 1059. We agreed, stating that

> the loss defendant subjectively intended to cause is not controlling if he was incapable of inflicting that loss. Because this was an undercover sting operation which was structured to sell stock to a pension fund that did not exist, defendant could not have occasioned any loss even if the scheme had been completed.

Id.

Galbraith relied in part on Santiago, in which we held that "whatever a defendant's subjective belief, an intended loss under Guidelines § 2F1.1 cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful." Santiago, 977 F.2d at 524. In that case the defendant fraudulently filed a claim of $11,000 with his insurance company. However, the market value of the car that he falsely claimed was stolen was only $4,800, which was the maximum amount the insurance company would have paid had his scheme been successful. In finding that the $4,800 was the intended loss, we looked to the economic reality of the situation and established the principle that "the fair market value of what a defendant has taken or attempted to take defines the upper limit for loss valuation." Id. at 525.

While there is no dispute that the fair market value of the properties that Mr. Ensminger attempted to obtain was $540,700, see Aplt. Brief at 12-13, there is also no dispute that there was no way in which the scheme could have been successful. Although Mr. Ensminger successfully persuaded a deputy clerk to

sign the "Special Execution" document, the properties he sought had already been sold to third parties. No record facts suggest that there was even a remote probability that he could have either obtained the properties or the proceeds from the sale of the properties. While it is true that Mr. Ensminger tried to obtain the properties, and perhaps thought he could succeed, under <u>Galbraith</u> we must still consider that "the loss defendant subjectively intended to cause is not controlling if he was incapable of inflicting that loss." <u>Galbraith</u>, 20 F.3d at 1059. Ordinarily, it would be necessary to remand for a determination on this issue; however, because the uncontroverted facts establish that there was no possibility for Mr. Ensminger to have succeeded in his scheme[1] we hold that the ten-level enhancement was clearly erroneous — applying <u>Galbraith</u>, the intended loss was zero.

We note that a number of circuits have disagreed with our analysis of intended loss in <u>Galbraith</u>, reasoning that it "is inconsistent with application note 10 to section 2F1.1 of the guidelines, which by authorizing a downward departure 'where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it' implies that the

_____

[1] This conclusion is not based on "governmental control over the civil execution process and judicial intervention," Aplt. Brief at 14, as Mr. Ensminger asserts. Such control does not preclude a remote possibility that he could have succeeded in his scheme. Rather, our conclusion is based on the fact that the properties had already been sold to third parties.

unlikelihood of an actual loss does not affect the computation of the 'intended loss.'" United States v. Coffman, 94 F.3d 330, 336 (7th Cir. 1996) (quoting USSG § 2F1.1 commentary at n.10 (1997)); see, e.g., United States v. Studevent, 116 F.3d 1559, 1561-64 (D.C. Cir. 1997); United States v. Wai-Keung, 115 F.3d 874, 877 (11th Cir. 1997), cert. denied, 118 S. Ct. 1095 (1998); United States v. Ismoila, 100 F.3d 380, 396-97 (5th Cir. 1996); United States v. Robinson, 94 F.3d 1325, 1328 (9th Cir. 1996).[2]  However, because "one panel of this court is bound by the precedent of an earlier panel absent en banc reconsideration or a superseding contrary decision of the U.S. Supreme Court," LeFever v. Commissioner of Internal Revenue, 100 F.3d 778, 787 (10th Cir. 1996), we are bound to apply Galbraith.

## B.  More Than Minimal Planning

Mr. Ensminger next contends that the district court erred in enhancing his base offense level by two levels for "more than minimal planning" pursuant to USSG § 2F1.1(b)(2)(A).  According to Mr. Ensminger, the government failed to

---

[2]  The dissent also cites cases from other circuits which "recognize the narrow holding of Galbraith."  However, in each of those cases the defendant's scheme had some possibility of success, but was thwarted by police intervention. Here, by contrast, police intervention was totally unnecessary, as Mr. Ensminger's scheme was inherently incapable of causing a loss due to the sale of the properties to third parties.

prove that he engaged in more planning than was necessary for committing the offense in its simple form. Because the district court's finding is essentially factual, we review it only for clear error.

The Guidelines regard "more than minimal planning" as present "in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." USSG § 1B1.1 commentary at n.1(f) (1997). In its ruling on the enhancement, the district court considered the following conduct: Mr. Ensminger took a form from the U.S. Attorney's Office and adapted it into his "Special Execution and Order" document, complete with detailed property descriptions; he presented the document to the district court clerk's office and convinced a deputy clerk to sign it; he then submitted the document to the U.S. Marshal's Office and, after he was informed that he needed additional money for processing fees, he had another person resubmit the document three weeks later with the proper fees; he followed this up with a telephone call to the Marshal's Office, a letter to the district court judge who had earlier presided over his civil case, and a letter to the U.S. Marshal demanding action on the seizure. See 4 R. at 19-20. The court concluded: "This is not an isolated instance. It is a case where several different times Mr. Ensminger was given a chance to back out of his criminal conduct for one thing but it's also simply repeated acts that were more than opportune." 4 R. at 20.

Mr. Ensminger argues that his actions after presenting the document to the U.S. Marshal's Office should not be considered, because the false statement was made when the document was presented. However, we agree with the district court that those actions were repeated acts done in furtherance of his central scheme to fraudulently obtain the properties. See United States v. Channapragada, 59 F.3d 62, 65-66 (7th Cir. 1995) (affirming enhancement for "repeated acts" where defendant misrepresented value of collateral and repeated it three more times). Therefore, the district court's two-level adjustment was not clearly erroneous.

## C. Special Conditions on Probation

Finally, Mr. Ensminger challenges the imposition of special conditions of supervised release relating to financial disclosures and restrictions.[3] He contends

---

[3] At the end of the sentencing hearing, the court imposed the following special conditions on his term of supervised release:

> You will disclose all assets and liabilities to the probation office. You will not transfer, sell, give away or otherwise convey any asset without first consulting with the probation office. You will, upon request of the probation office, authorize release of any and all financial records, income tax records and Social Security records. You will maintain a single checking account in your name which you will use for the deposit of all income and other pecuniary proceeds and used [sic] for the payment of all personal expenses. All other bank accounts must be disclosed to the probation office. You will not make application for any loan or enter into any credit

- 9 -

that the conditions are not reasonably related to the crime of conviction.  We review for abuse of discretion.  See United States v. Edgin, 92 F.3d 1044, 1047 (10th Cir. 1996).

Although a district court has broad discretion in setting conditions of supervised release, see id. at 1048, any condition chosen must

> (1) [be] reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);[4]
>
> (2) involve[] no greater deprivation of liberty than is necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) [be] consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 944(a).

18 U.S.C. § 3583(d)(1)-(3).

The district court imposed the special conditions at the end of the sentencing hearing, after it had resolved all the objections to the presentence

---

arrangement without consulting the probation office.  If you maintain an interest in any business or enterprise, you will, on request, make available any of the records of that business to the probation enterprise [sic].

4 R. at 25-26.

[4]  Under these provisions of 18 U.S.C. § 3553(a), a court must consider (a) "the nature and circumstances of the offense and the history and characteristics of the defendant," and (b) the need to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed . . . training, medical care, or other correctional treatment."

report and after Mr. Ensminger had already made his final statement.  Mr. Ensminger did not object to the conditions.  However, under similar circumstances in Edgin, we found that there was no waiver of the issue for appeal.  See Edgin, 92 F.3d at 1049.

In Edgin, we considered the propriety of a special condition which prevented the defendant from contacting his son.  Because the district court in Edgin failed to make factual findings or provide any reasons for that special condition, we remanded so that the court could state its reasoning.  Likewise, the district court in the case at bar provided no reasons for its conditions of financial disclosures and restrictions.  However, in Edgin we noted that a father generally "has a fundamental liberty interest in maintaining his familial relationship with his son," id., and stated that the district court must "fine-tune" restrictions of such a liberty interest to meet the goals of § 3553(a)(2)(B)-(D).  Here no such fundamental interests are involved, and thus the same level of "fine-tuning" is not required.

Under § 3583(d), a special condition of supervised release must be reasonably related to "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and must involve no greater deprivation of liberty than is reasonably necessary in light of the need "to protect the public from further crimes of the defendant."  All three counts of

the indictment relate to Mr. Ensminger's attempts to defraud financial institutions. See 2 R. at 3. Mr. Ensminger belongs to an organization, "We The People," which "does not believe the federal banking system has authority after they ceased being backed by the gold standard." 2 R. at 12. After First National Bank of Okeene, Oklahoma and Federal Land Bank of Enid, Oklahoma refused to honor the false money orders which formed the basis of counts one and two, Mr. Ensminger filed "Notices of Defaults" against the banks. Given Mr. Ensminger's history and characteristics, and the need to protect the public from further similar crimes, we conclude that financial conditions imposed upon Mr. Ensminger meet the requirements of 18 U.S.C. § 3583(d).

Although we AFFIRM the district court's enhancement for more than minimal planning and imposition of special conditions, we REMAND to the district court to VACATE its sentence and resentence in accordance with this opinion.

98-6179, *United States v. Ensminger*

**Anderson, Circuit Judge, dissenting in part:**

The majority reverses the ten-level enhancement for an intended loss of

$540,000, finding that our prior decisions in United States v. Galbraith, 20 F.3d

1054 (10th Cir. 1994) and United States v. Santiago, 977 F.2d 517 (10th Cir.

1992), are indistinguishable from this case and compel the conclusion that the

intended loss was zero.  Because I conclude that those decisions are

distinguishable and do not compel that conclusion, I respectfully dissent from Part

A of the majority opinion.

Galbraith involved a government sting operation, in which the defendant

attempted to purchase stock in a company, drive up the price, and then sell it to a

European pension fund.  Unbeknownst to the defendant, the European pension

fund did not exist and the FBI terminated the sting operation and arrested the

defendant before any stock was actually bought or sold.  We held in that case that

"The intended or probable loss was zero" because:

> the loss defendant subjectively intended to cause is not controlling if
> he was incapable of inflicting that loss.  Because this was an
> undercover sting operation which was structured to sell stock to a
> pension fund that did not exist, defendant could not have occasioned
> any loss even if the scheme had been completed.

Galbraith, 20 F.3d at 1059 (emphasis added).

In so holding, we relied in part on Santiago, in which the defendant

attempted to defraud his insurance company by falsely reporting that his car, with

a "blue book" value of $4,800, had been stolen, and submitting a claim for $11,000 for the "stolen" car. Because an acquaintance involved in the scheme notified law enforcement authorities, the scam did not succeed. After noting that no actual loss occurred because of police intervention, we held that the "intended [and] probable loss" was $4,800 because the "insurance company would not have paid more than the car's $4,800 blue book value in any circumstances." Santiago, 977 F.2d at 524, 526.[1]

Considering Santiago and Galbraith together, I do not believe that the intended loss is zero whenever the actual loss is zero, even where, as here, the scheme to defraud is doomed from the beginning. There is a distinction between a scheme, as in Galbraith, which is structurally and inherently incapable of causing any loss (an undercover reverse sting operation involving the sale of overvalued stock to a non-existent entity) and a scheme such as Mr. Ensminger's which, while extremely unlikely to result in any loss, nonetheless could have occasioned a loss had the scheme succeeded. The majority opines that Mr. Ensminger's plan was incapable of success because, while he had successfully persuaded a deputy clerk to sign the "Special Execution" document,

---

[1]The reference to "probable" loss in Santiago and Galbraith stems from that fact that, prior to November 1, 1991, Application note 7 to § 2F1.1 referred to "probable or intended loss." Effective November 1, 1991, "probable" was deleted. U.S.S.G. App. C, amend. 393.

the properties had in fact already been sold to third parties, and Mr. Ensminger would therefore have been unable to obtain them. But that is no different from Santiago, in which the acquaintance had notified authorities, who then notified the insurance company, so that the defendant would in fact have been unable to collect any insurance proceeds. Indeed, if a person presents an instrument to a bank with the intent of defrauding it of $100,000, but the bank in fact has no money, the person has no less attempted the fraud, and intended a loss, even though *in fact* no loss could have occurred.[2]

Other courts have recognized the narrow holding of Galbraith. Indeed, in United States v. Studevent, 116 F.3d 1559, 1564 (D.C. Cir. 1997), the court expressed its disagreement with what it viewed as Galbraith's holding but noted that Galbraith itself was correctly decided under any view of intended loss:

> The victim in Galbraith–a pension fund to which overvalued stock was to be sold–was a Potemkin institution fabricated by law

---

[2]The majority suggests that Galbraith is inconsistent with application note 10 to § 2F1.1, which authorizes a downward departure "where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it." If a downward departure is authorized for an obviously fraudulent scheme, so the argument goes, the guidelines must have assumed that the unlikelihood of success is irrelevant to the calculation of intended loss. But the extreme unlikelihood of success is still different from structural and absolute impossibility. The fact that a scheme's success may depend on the stupidity or naivete of others does not mean that it is incapable of success. Even the most harebrained of schemes may, perchance, succeed, whereas a government sting of the sort employed in Galbraith could never, under any circumstance, result in a loss to anyone.

enforcement officials.  Galbraith thus never could have defrauded anyone.  Studevent, on the other hand, stole checks from real entities and thus had real potential victims who could have been defrauded but for the intervention of the FBI.

Studevent, 116 F.3d at 1563 n.3; see also United States v. Rizzo, 121 F.3d 794, 802 (1st Cir. 1997) ("Unlike the fictitious victim in Galbraith, the intended victims of Rizzo's counterfeit check scheme were actual corporations."); United States v. Coffman, 94 F.3d 330, 337 (7th Cir. 1996) ("[E]ven if . . . [Galbraith] were decided correctly, [it] would not carry the day for the defendants[] [because it is a case] where the fraud would have done no harm even if the defendants had not been interrupted[] [whereas h]ere the fraud had a real victim in its sights but was interrupted before it could do any harm."); United States v. Falcioni, 45 F.3d 24, 27 (2d Cir. 1995) (noting Galbraith's "limited exception to use of the intended loss figure" and stating that "Falcioni's plan failed to result in loss, not because his victim was a non-existent entity, but rather because [an acquaintance] notified law enforcement authorities"); cf. United States v. Sheets, 65 F.3d 752, 753-54 (8th Cir. 1995) (holding defendant liable for intended loss created by filing false tax return for someone else, even though intended victim demonstrated to IRS that tax return was bogus).

In sum, rather than implicitly criticize our holding in Galbraith, as does the majority, I would simply confine Galbraith to its narrow factual setting.  And, following Santiago, I would calculate the intended loss of Mr. Ensminger's

scheme not at zero, as does the majority, but, as did the district court, at the fair market value of the real property which was the object of his attempted fraud.