**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert COFFMAN, Jerry Beller, and
Thresher T. Rippey, Defendants–
Appellants.**

**Nos. 95–3217, 95–3909 & 95–3995.**

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1996.

Decided Aug. 27, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied in Nos. 95–3217
and 95–3909 Sept. 19, 1996.

---

**2.** Appellees also have filed a motion for sanctions under Federal Rule of Appellate Procedure 38.

This motion is denied.

Barry Rand Elden, Chief of Appeals, James Conway (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for United States.

William H. Theis (argued), Chicago, IL, for Robert Coffman.

William A. Barnett, Jr., Chicago, IL, Matthew Horan (argued), Fort Smith, AR, for Jerry Beller.

Robert G. Clarke (argued), Chicago, IL, for Thresher T. Rippey.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

The appellants, Beller, Coffman, and Rippey, along with two other persons, were convicted by a jury of six counts of wire fraud, in violation of 18 U.S.C. § 1343, and were sentenced to prison terms ranging from 13 to 18 months. The statute forbids the use of the telephone or other modes of transmission by wire for the purpose of executing a "scheme or artifice to defraud." (The mail-fraud statute, 18 U.S.C. § 1341, is similar, except that the method of execution is the mail rather than transmission by wire.) Here is the scheme the government proved: On May 9, 1989, Stoller, one of the defendants who is not an appellant, placed an unsolicited phone call to Smith Barney's Chicago office. He told the broker who answered the call, McCausland by name, that he wanted to sell several million dollars of stock through Smith Barney, including restricted stock of the Firestone Development Company. McCausland smelled a rat. It is unusual for someone to want to sell millions of dollars of stock through whoever just happens to pick up the phone at a brokerage house with which the caller appears to have had no previous dealings. And restricted stock, which as the parties use the term (it bears a different meaning in securities law) is stock that cannot be sold until a future date stated on the stock certificate, is usually issued to corporate insiders, and Stoller had not indicated that he was one. McCausland reported his suspicions to his superiors, who called in the FBI, which designated an agent to pose as an employee of Smith Barney. The next day Stoller met with McCausland and represented himself as controlling a pool of assets that included $30 million worth of stock of FDC. FDC had been created by Beller in 1987. It had never had any value, but Beller had represented its value to be tens and at times hundreds of millions of dollars and had also misrepresented that a member of the Firestone tire family was the chairman of the board.

Stoller offered to put up $1 million in restricted stock of FDC as collateral for a loan of $300,000; the restriction would expire in about six weeks. He gave McCausland a sheaf of papers purporting to demonstrate the financial solidity of the persons and firms involved in the transaction, including a fax to Stoller from defendant Coffman, dated March 7, 1989, representing FDC as having assets of $35 million, and phony balance sheets of Coffman, who was to be the borrower of the $300,000 (Stoller acting as the broker in exchange for a fee of $100,000), and of the firm on behalf of which Coffman was supposedly borrowing. According to these balance sheets, Coffman had a net worth of $76 million and his firm $266 million. In fact, neither he nor his firm had any assets.

McCausland and the FBI played along with this nonsense, and on May 22 he and the agent met with the defendants (all but Beller, who however participated in the meeting by telephone) purportedly to finalize the transaction. At the meeting Rippey said that FDC was active in the telecommunications, real estate, and convenience store markets; actually it was an empty shell. He also

said that after the loan of the $300,000 was completed there would be another $30 million in FDC stock available for collateralizing future loans by Smith Barney. Coffman explained that the $300,000 loan would be the seed money for an ambitious project. All these were lies. When the time came to disburse the loan, the FBI broke up the meeting and arrested the defendants present; Beller was arrested later. The six counts of which the defendants were convicted were based on the March 7 fax from Coffman, other wire communications purporting to demonstrate the defendants' wealth, and Beller's telephonic participation in the May 22 meeting.

■ The appellants argue that the evidence was insufficient to convict them because their misrepresentations, which primarily involved grossly exaggerating their wealth, could not have influenced Smith Barney in deciding whether to lend them the $300,000, and this for three reasons: 1. The wealth of the borrower is immaterial to a margin loan, that is, a loan collateralized by stock owned by the borrower. Smith Barney does not run a credit check on a margin borrower or require a loan application indicating the borrower's financial status. All it checks on is the value of the stock. 2. Margin loans cannot lawfully be made on restricted stock. 3. Smith Barney is a sophisticated business, and no sophisticated business would be taken in by the defendants' preposterous misrepresentations. A person worth $76 million does not pay a broker (Stoller) $100,000 to borrow $300,000.

None of these reasons holds water. 2 is simply false. No law or business custom forbids the making of margin loans collateralized by restricted stock. Of course, the restriction, by reducing the liquidity of the stock, reduces its value as collateral. Here, however, the borrower was seeking only a third of the purported value of the stock, and the restriction was due to expire in only six weeks. As for 1, the more affluent the borrower, and the greater the prospect of lucrative future business with the borrower and his associates, the less likely the lender is to conduct a searching investigation into the actual value of the stock tendered as collateral. Moreover, the misrepresentation of the value of FDC stock (it had no value) was clearly material to a decision whether to lend money on the security of it. As for point 3, the most substantial point and the one the defendants press hardest, if they intended to obtain money by lying about the collateral and their financial status and prospects, it is not a defense that the intended victim was too smart to be taken in. McCausland was unusually alert. Had he not been, the scheme might have succeeded. But even if the prospects for success were as poor as the defendants argue—even if they were quite negligible—the defendants would not be off the hook.

The statute punishes the scheme (more precisely, the use of the telephone or cognate means of communication to conduct the scheme) rather than the completed fraud. E.g., *United States v. Richman*, 944 F.2d 323, 331 n. 9 (7th Cir.1991). It punishes, in short, the attempt to defraud. *United States v. Utz*, 886 F.2d 1148, 1150 (9th Cir.1989) (per curiam). Attempts are punished even when the chance of success is dim—even when the facts are such that, unbeknownst to the defendant, the attempt could not possibly succeed. *United States v. Cotts*, 14 F.3d 300, 307 (7th Cir.1994); *United States v. Dominguez*, 992 F.2d 678, 682 (7th Cir.1993). If it could not succeed because the completed act at which the defendant aimed is not criminal—as where a 13–year–old boy attempts to commit rape in a state in which you must be 14 to be charged with rape, *Foster v. Commonwealth*, 96 Va. 306, 31 S.E. 503, 505 (1898)—then a defense of impossibility will lie; it is not a criminal attempt to try to do what the criminal law does not forbid you to do. But if the attempt is merely thwarted, and if completed in accordance with the defendant's understanding of the circumstances would have resulted in a crime, then the attempt is culpable even though it is certain that it would not have succeeded. *Cotts*—a case involving a conspiracy to kill a fictitious informant (of course not known to the defendant to be fictitious)—is a dramatic example of this principle, and the present case is well within its orbit. There may be attempts so feeble, such as sticking a pin into a voodoo doll of your enemy in an effort to kill him,

that the attempter is entitled to be acquitted, as a harmless fool. *Attorney General v. Sillem*, 2 H. & C. 431, 525–26, 159 Eng.Rep. 178, 221 (Exch.1863); American Law Institute, *Model Penal Code* § 5.05(2) (1962). The defendants' scheme, though harebrained, was not that harebrained. Cf. *State v. Smith*, 262 N.J.Super. 487, 621 A.2d 493, 505 (1993).

It is true that many cases, including some in this court, say that a scheme to defraud is not within the reach of the mail- or wire-fraud statutes unless a reasonable person would be deceived by the defendants' misrepresentations. E.g., *Spiegel v. Continental Ill. Nat'l Bank*, 790 F.2d 638, 646 (7th Cir. 1986); *United States v. Brown*, 79 F.3d 1550, 1557–59 (11th Cir.1996); *United States v. Brandon*, 17 F.3d 409, 425 (1st Cir.1994). But it is hard to believe that this language is intended to be understood literally, for if it were it would invite con men to prey on people of below-average judgment or intelligence, who are anyway the biggest targets of such criminals and hence the people most needful of the law's protection—and most needful or not are within its protective scope. *United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir.1991); *United States v. Brien*, 617 F.2d 299, 311 (1st Cir.1980). "Taking advantage of the vulnerable is a leitmotif of fraud." *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1347 (7th Cir. 1995). It would be very odd for the law to protect only those who, being able to protect themselves, do not need the law's protection. In fact picking on the vulnerable normally makes your conduct more rather than less culpable, earning you a heavier sentence. We applied this principle to fraud in *United States v. Newman*, 965 F.2d 206, 211 (7th Cir.1992).

*Biesiadecki* aligns us with those courts that hold that the mail- and wire-fraud statutes protect the gullible against frauds directed against them, yet *Spiegel* aligns us with those courts that define mail and wire fraud in terms of misrepresentations or omissions calculated to deceive a reasonable person. We doubt that there is real inconsistency. The "reasonable person" language has two purposes, neither of which has anything

to do with declaring open season on the people most likely to be targets of fraud. The first is to guide the jury in evaluating circumstantial evidence of fraudulent intent: that the defendants' scheme was calculated to deceive a person of ordinary prudence is some evidence that it was intended to deceive. E.g., *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389–90 (6th Cir.1996). Evidence that the scheme could fool only an idiot would not be evidence of such intent—would be, if anything, evidence against an inference of such intent—unless the scheme was aimed at an idiot. But if it were, this would make it a case of direct evidence of wrongful intent. The fact that a reasonable person would not have been deceived would be no more relevant than the fact that a murder victim would have survived had he been wearing a bulletproof vest.

Second, the "reasonable person" language gestures, although clumsily, toward the indistinct border zone between real fraud and sharp dealing. Almost all sellers engage in a certain amount of puffing; all buyers, even those who are rather gullible, know this; it would not do to criminalize business conduct that is customary rather than exceptional and is relatively harmless. The cases carve a safe harbor for the type of misrepresentation that, being so commonplace as to be "normal," is not likely to fool anyone. *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir.1991); *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir.1989); *United States v. Goodman*, 984 F.2d 235, 240 (8th Cir.1993). This is not such a case. Indeed, the defendants' argument is not that they were just puffing, but that their misrepresentations were so gross as to be unbelievable. They ask that the safe harbor for small lies be expanded to include the biggest whoppers. But there is a difference between lies so small that they are discounted in advance, as part of the language of business, and so are harmless, and lies so large that the sophisticated see through them. The latter lies are not normal. Most people who are worth nothing do not claim to a prospective lender to be worth $76 million. The extravagance of the lie may make it difficult to believe, but

we saw earlier that a scheme to defraud is not excused by being unlikely to succeed.

The defendants also argue that the various communications on which the indictment is based were not in furtherance of the scheme to defraud. The communications concerned their wealth, and they say their wealth was irrelevant to the loan. It wasn't, as we have seen. And the fact that some of the communications were made before the defendants decided to call Smith Barney is irrelevant. A scheme to defraud can, and often does, begin before the victim is picked. E.g., *United States v. Morris*, 80 F.3d 1151, 1160 (7th Cir.1996); *United States v. Boula*, 932 F.2d 651, 652 (7th Cir.1991).

So the statute was violated. But the defendants argue that they should get a new trial because the jury wasn't instructed that their misrepresentations, to be culpable, had to be material. In so arguing they rely on the cases, notably *United States v. Gaudin*, — U.S. —, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), which hold that the defendant in a case charging a false statement (to a credit union, a bank, the Internal Revenue Service, a government procurement agency, and so on) is entitled to such an instruction. But the reason is that Congress did not intend to criminalize immaterial false statements even if willful. A person might lie about his age on a loan application not because he thought taking two years off his actual age would make him a better loan prospect but because he didn't want anyone to find out his true age (he might fear age discrimination by his employer, or have a young girlfriend). That is not the sort of lie that the false-statement statutes were intended to criminalize, because it does not endanger the lender.

No more did Congress want to classify immaterial lies as frauds for purpose of the mail- and wire-fraud statutes. But whereas the statutory term "false statement" contains no hint of materiality, so that the jury has to be instructed separately on that element, the term "fraud" embodies the concept of materiality. Fraud is a *material* misrepresentation or omission, in the sense of one relevant to the decision that the perpetrator of the fraud wants his intended victim to make. E.g., W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 108, p. 753 (5th ed. 1984). An instruction in the language of the statute adequately puts the issue before the jury and allows the defendant's lawyer to argue in his closing statement that there was no scheme to defraud because the misrepresentation concerned a matter that was irrelevant to the decision of the purported victim to deal with the defendant. There is no objection to an instruction explaining the meaning of fraud to the jury, such as the instruction in 2 Edward J. Devitt, Charles B. Blackmar & Kevin F. O'Malley, *Federal Jury Practice and Instructions: Criminal* § 40.13, p. 521 (4th ed. 1990), but only the Ninth Circuit thinks such an instruction mandatory. *United States v. Halbert*, 640 F.2d 1000, 1007–08 (9th Cir.1981). Even if the Ninth Circuit were right, the omission of the instruction here would be a harmless error (as it was in *Halbert*) in view of the overwhelming evidence of materiality.

In a case in which the defense was that the misrepresentation was mere puffery, however, the defendant would be entitled to an instruction putting this defense before the jury, provided of course that there was some evidence to support the defense. *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996). This could be described as a defense of immateriality—though alternatively as simply a denial that the defendant engaged in fraud. But that was not the defense here, as we have seen.

■ Coffman advances a second ground for a new trial. After deliberating for several hours, the jury sent a note to the judge stating, "We have been able to reach a verdict on defendants Beller and Rippey. We cannot reach a unanimous decision with respect to Mr. Coffman." Without reassembling the defendants and the lawyers, the judge told the court security officer to tell the jury to keep deliberating, and the officer told the jury to keep deliberating until the lawyers arrived. By the time the parties and lawyers were reassembled in the courtroom, the jury had reached its verdict on Coffman: guilty.

The judge's response to the jury's note was erroneous, as the government concedes. The defendant is entitled to be present at all

stages of his trial, Fed.R.Crim.P. 43(a), and a judge's response to a note from the jury is one of those stages. *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975); *United States v. Neff,* 10 F.3d 1321, 1324 (7th Cir.1993). But the infringement of this right does not entitle the defendant to a new trial if it is unlikely to have affected the jury's verdict. *United States v. Patterson,* 23 F.3d 1239, 1255 (7th Cir.1994). That is the case here. The jury had been deliberating for about ten hours when it announced its inability to make up its collective mind about Coffman. In such circumstances the trial judge would be expected to tell the jury to make another effort to arrive at a verdict. *Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896); *United States v. Kwiat,* 817 F.2d 440, 446 (7th Cir.1987); *United States v. Silvern,* 484 F.2d 879, 883 (7th Cir.1973) (en banc). So if the judge had not responded to the note before reassembling the participants, the only difference this would have made would have been that the direction to the jury to keep deliberating would have been sent 20 minutes later.

The form of the direction would, no doubt, have been somewhat different, in line with the form approved in *Silvern.* The direction actually given was abrupt, peremptory, and the rapidity with which the jury responded by bringing in a verdict could be thought evidence that it felt coerced by the judge's instruction. *United States v. Russell,* 971 F.2d 1098, 1108 (4th Cir.1992); *United States v. Thomas,* 946 F.2d 73, 76 (8th Cir.1991). Still, a bare instruction to keep deliberating does not warrant reversal. *United States v. Kramer,* 955 F.2d 479, 489 (7th Cir.1992); *United States v. D'Antonio,* 801 F.2d 979, 983–84 (7th Cir.1986); *United States v. Thibodeaux,* 758 F.2d 199, 203 (7th Cir.1985). As in those cases, so here, the note was noncommittal; it did not lean in favor of the prosecution; it did not ask the jurors to surrender their individual convictions in the interest of a prompt unanimous verdict. As for the 20–minute delay, had the jury been left in the dark for that amount of time or longer while the defendant and the lawyers were brought back into the courtroom, a subsequent instruction couched in the terms of *Silvern* would have been unlikely to have had any less effect on the jury's decision to bring its deliberations to a rapid close.

■ The final set of issues that has enough merit to warrant discussion concerns the amount of loss used in figuring the defendants' sentences under the sentencing guidelines. The guidelines direct the sentencing judge in fraud cases to use the "intended loss" rather than the actual loss if the former is greater. U.S.S.G. § 2F1.1, application note 7. So the judge figured the loss at $300,000, the amount that the defendants intended to obtain fraudulently from Smith Barney. The defendants argue that the interposition of the FBI before any money changed hands ensured that the actual loss would be zero and that in such a case the intended loss can be no greater. Their argument is that a loss that cannot possibly occur cannot be intended. The argument is inconsistent with application note 10 to section 2F1.1 of the guidelines, which by authorizing a downward departure "where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would seriously consider honoring it" implies that the unlikelihood of an actual loss does not affect the computation of the "intended loss." The argument also gives a twisted meaning to the word "intended" and would, if accepted, irrationally erase any distinction in the severity of punishment between a defendant who tries to defraud his victim of $1,000 and a defendant who tries to defraud his victim of $1,000,000.

We are mindful that several cases—*United States v. Galbraith,* 20 F.3d 1054, 1059 (10th Cir.1994); *United States v. Santiago,* 977 F.2d 517, 524 (10th Cir.1992), and *United States v. Khan,* 969 F.2d 218, 220 (6th Cir. 1992)—hold that the intended loss is indeed zero when, for example because the fraud is induced by a government sting operation, the loss would have been zero even if the scheme had not been interrupted. In effect these cases recognize impossibility as a mitigating factor in sentencing in circumstances where it would not mitigate guilt. That is not an incoherent position, yet it seems plain to us that the place for mitigation on the basis of a large discrepancy between intended and

probable loss is, under the guidelines, in the decision whether to depart downward, rather than in the calculation of the intended loss. We know that frauds that have no chance of succeeding are nevertheless punishable, and it would be extremely odd, as well as contrary to the language of the guidelines, to treat all such frauds the same, as frauds involving an intended loss of zero, even if the magnitude of the intended loss differed vastly.

But even if this is wrong and the cases we cited were decided correctly, they would not carry the day for the defendants. They are cases where the fraud would have done no harm even if the defendants had not been interrupted. Here the fraud had a real victim in its sights but was interrupted before it could do any harm. That makes this a clear case of attempted fraud, where the intended loss is the relevant benchmark rather than the actual loss, by definition zero because it was only an attempt. *United States v. Falcioni*, 45 F.3d 24, 26–27 (2d Cir.1995). We add that because the sentence is to be based on the intended rather than the actual loss, the three-level downward adjustment for attempts, U.S.S.G. § 2X1.1(b)(1), is inapplicable, *United States v. Strozier*, 981 F.2d 281, 285–286 (7th Cir.1992); *United States v. Yusufu*, 63 F.3d 505, 513–14 (7th Cir.1995)—wholly apart from the inappropriateness of making such an adjustment when the substantive offense, mail or wire fraud, is a crime of attempting rather than attaining.

■ We agree with defendant Beller, however, that the judge should not have jacked up the intended loss to $457,000 by adding in, as conduct relevant to the offense of conviction, the amount for which Beller had bilked some purchasers of the worthless stock of FDC back in 1987. That fraud was related to the scheme to defraud Smith Barney in 1989 only in the use of FDC stock in both schemes. The use of the same instrument of crime on separate occasions involving different victims does not establish relevant conduct within the meaning of the guidelines, which define it as "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). There was no more a common scheme, or the same course of conduct, than

if Beller had used the same gun to hold up two different people two years apart.

The purpose of the guideline on relevant conduct is to base a defendant's sentence on the most serious crime that he committed, as distinct from the crime of which he was convicted, up to the statutory maximum for a sentence for that crime. *United States v. Ritsema*, 31 F.3d 559, 564–65 (7th Cir.1994); *United States v. Masters*, 978 F.2d 281, 284 (7th Cir.1992). A defendant might commit arson in the course of which a person died, and be convicted of arson; he would be sentenced as if for murder, though of course his sentence could not exceed the statutory maximum for arson. *United States v. Martinez*, 16 F.3d 202 (7th Cir.1994). This is not such a case. The scheme to obtain a loan collateralized by FDC stock began on or shortly before March 1989. The defrauding of investors in FDC was a separate scheme, carried out two years earlier. It was separate in time and involved different victims and a different method of employing FDC to defraud, namely by selling FDC stock rather than by borrowing against the security of the stock. That is only a small difference; the real point is that there were two schemes rather than one. See U.S.S.G. § 1B1.3, application note 9.

■ The error is harmless, though. The guidelines applicable to Beller's sentence do not distinguish between a $300,000 and a $457,000 loss. They are within the same zone, which runs from $200,001 to $500,000. U.S.S.G. § 2F1.1(b)(1)(H) (1987). The current guidelines do distinguish between them, U.S.S.G. §§ 2F1.1(b)(1)(I)–(J), but are inapplicable to these defendants. We do not think it reasonable to suppose that had the judge not classified Beller's other fraud as related conduct, he would have given him a lighter sentence within the guidelines range. For within that range the judge is free to consider any factor bearing on the appropriate sentence, and Beller's previous fraud, however classified, was certainly such a factor.

AFFIRMED.