**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Frank J. BONANNO and Lawrence
J. Goldstein, Defendants–
Appellants.**

**Nos. 96–3918, 96–4016.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 3, 1997.

Decided June 12, 1998.

Rehearing Denied July 9, 1998.

Robert W. Kent, Jr., Debra Riggs Bonamici (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

Christopher Jeska (argued), Chicago, IL, for Defendant–Appellant Bonanno.

Robert A. Handelsman (argued), Chicago, IL, for Defendant–Appellant Goldstein.

Before CUMMINGS, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

In this appeal, two convicted defendants challenge various aspects of their sentencing. The two defendants, Frank Bonanno and Lawrence Goldstein, were charged and convicted before a jury for their roles in a conspiracy to sell bogus auto insurance policies to innocent consumers in the State of Illinois.

Bonanno and Goldstein were each sentenced to thirty months' incarceration and claim that the district court made several errors in sentencing. Initially, they argue that the trial judge erred in the manner in which he calculated the amount of loss that the defendants intended to cause by their scheme. Secondly, they allege that they are entitled to resentencing because the sentencing judge failed to specify the number of drug tests to which the defendants must submit, and instead improperly left that determination to the probation officer. Next, they argue that there are fatal discrepancies between the trial judge's oral pronouncements and his written orders. And, lastly, defendant Bonanno claims that the judge erred when he determined that Bonanno failed to accept responsibility for his conduct.

We remand this case to the district judge for the limited purpose of having him specify the number of drug tests to which the defendants must submit. We affirm on all other counts.

## I. BACKGROUND

In early 1993, defendant-appellant Lawrence Goldstein and his acquaintance Harry Gio[1] devised an auto insurance fraud. It involved three shell companies: a phony insurance company named American United Casualty Company, Inc. ("American United Casualty," or, "the insurance company"), a payment company named American United Payment Services, Inc. ("the payment company"), and a phony auto insurance agency named Auto Insurance Headquarters Agency, Inc. ("Auto Insurance Headquarters," or, "the agency"). On March 22 and March 23, 1993, Gio, with Goldstein's knowledge and consent, arranged to incorporate the insurance company and the payment company with the Office of the Illinois Secretary of State. As part of an effort to conceal their operational control of these companies, Gio and Goldstein listed Vincenzo Catalano as the sole incorporator and registered agent on the articles of incorporation. Catalano, who was capable of signing his name but other than that could neither read the English language nor write the same, agreed to sign the papers after he was told that if he did so Gio would help him get a driver's license. He had no relationship with either company.

The third company, the auto insurance agency, did not become operational for another few months, becoming incorporated on May 7, 1993. The conspirators did not use Vincenzo Catalano's name on the "Auto Insurance Headquarters" articles of incorporation, as they had with the other two companies: Goldstein listed himself as the agency's sole incorporator and registered agent. Goldstein also set himself up as the president and sole shareholder of the company because, unlike Gio, Goldstein had an insurance producer's license—Gio could not obtain such a license because of a prior felony conviction.

Prior to the agency's incorporation, at the end of March, 1993, Goldstein and Gio undertook all the necessary things for setting up and leasing office space for the three companies. Goldstein signed the lease in his capacity as president of Auto Insurance Headquarters, and the two partners leased office furniture, opened checking accounts (in Goldstein's name), and had stationery and insurance forms prepared. They even arranged for the production and broadcast of two television commercials, in which Auto Insurance Headquarters presented itself as a low-cost automobile insurance agency.

Beginning in April, 1993, helped by several office employees, they commenced selling auto insurance policies. The policies were literally not worth the paper they were printed on, as they had nothing to back them up. This did not interfere with the conspirators' zeal to sell them, however: when customers called to inquire about buying automobile insurance, the conspirators quoted rates and accepted orders without even bothering to investigate the driver's record for moving traffic violations. If the customer agreed to purchase a policy, Gio and Goldstein would send one of their "runners" to the customer's house so that the customer could sign the contract for the policy. The "runner" would also collect the initial payment (subsequent payments were sent through the mail or personally delivered by the customer). Gio and Goldstein would then mail the customer a declaration sheet that contained the terms of the policy, with the policy purportedly issued by American United Casualty. The declaration sheets bore the signature of a supposed employee of American United Casualty named "Hal Breizman." Problem was, "Hal Breizman" did not exist. The "Hal Breizman" signatures were created by means of a stamp kept in the Auto Insurance Headquarters office.[2]

One of the runners employed by Gio and Goldstein was Frank Bonanno, who, along with Goldstein, is an appellant in this case. Bonanno claims, and the jury agreed with him, that at the time he was hired in April 1993 he believed the business to be legitimate. But he did admit to an F.B.I. investi-

---

1. Harry Gio was charged in the conspiracy along with Goldstein and Bonanno. Unlike Goldstein and Bonanno, however, Gio pled guilty. He is not part of this appeal.

2. "Hal Breizman" was not the only fictional character utilized in the scheme. Goldstein used the alter ego "Larry Gold" when speaking to or corresponding with customers; Bonanno and Gio at times used the alter ego "Frank Rossi."

gator (shortly after his arrest, which occurred around March 6, 1996) that at some point during his involvement with the business he found out that it was a fraud but continued to work there anyway. The specific date that he became aware that the business was a sham was a matter of dispute at trial, with different witnesses positing different dates. Bonanno, who did not testify, claimed in a pretrial statement and at sentencing that he discovered things were not on the level in late June or early July 1993. Gio, who did testify, presented another scenario. Gio testified that Bonanno "had full knowledge of what was going on the entire time—*even before he signed on* (in April 1993)" (emphasis added). Gio seemingly contradicted himself later in his testimony, however, by testifying that Bonanno did not discover the true nature of the business until he had been working there for a while and "realized that we were not placing the policies [with any insurance companies]," whereupon Gio told him that the business was a fraud.

Another witness, the F.B.I. investigator, offered a third scenario. The F.B.I. investigator, who spoke to Bonanno shortly after Bonanno was arrested, testified that Bonanno told him that he found out the business was a fraud "soon after" he commenced working there. And lastly, during trial, Bonanno's counsel proposed two *more* possibilities: first, that Bonanno was ignorant of the fraudulent nature of the business until Gio asked him to lie to Gio's probation officer (Bonanno first spoke to Gio's probation officer on July 26, 1993, so Gio's request presumably was shortly before this); then, later in the trial, Bonanno's counsel argued that Bonanno found out only "a couple of weeks before the place shut down" (this would have been about mid-August 1993, seeing as the Illinois Department of Insurance ("IDOI") shut the place down on August 27, 1993).

Regardless of the specific date when Bonanno found out about the company's true nature, it is undisputed that Bonanno rocketed to the top of the agency soon after starting there. From his start as a runner in late April, he was promoted to sales in early May. By the end of May, he had advanced up the

ladder to the office of president of the company, achieving this lofty position after Goldstein left the company. Goldstein's departure came about after he told Gio, in early May 1993, that he wanted out because what they were doing was illegal. Gio arranged for Bonanno to purchase the agency from Goldstein. Bonanno was not completely unfamiliar with the insurance industry, as at one time he had an insurance producer's license. He had allowed this license to lapse, though, and, because a license was required when he took over as president, he enrolled in and completed an insurance refresher course. On May 25, 1993 Bonanno's producer's license was reinstated, and at that time he signed a contract for the purchase of the agency, backdating the contract to April 1993. From then on, Bonanno was the nominal owner and president of the agency (*true* control of the agency remained in Gio's hands). Even though Goldstein was officially out of the company, he did not completely sever ties with the fraudulent scheme: he continued to profit from its operation by leasing pagers to the agency, and he also referred customers to the agency, including at least one customer in August 1993.

As president, Bonanno helped Gio perpetuate the scheme by giving misinformation to Gio's probation officer, on two different occasions. The first was on July 26, 1993, when Gio's probation officer telephoned Bonanno, because he (Bonanno) was ostensibly Gio's employer. In this conversation, Bonanno misled the officer as he deliberately understated Gio's duties and responsibilities with the company. The second time was when Bonanno met with the probation officer on August 18, 1993. On this second occasion he misled the probation officer by telling him that the agency placed clients with several different insurance companies.

The entire fraud was short-lived, existing only from April to late August 1993. In late August the IDOI became aware of the scheme, investigated the matter, and obtained an order of conservation (from an Illinois state court judge) giving the IDOI authority to take over the operation. On August 27, 1993, the IDOI closed down Auto Insurance Headquarters, seized all its books

and records, and began contacting its customers, informing them that policies issued by American United Casualty and sold through Auto Insurance Headquarters were invalid and worthless.

The four-month conspiracy caused extensive harm to a number of innocent victims. Between April and August, some 877 customers purchased worthless policies, contracting to pay a total of $622,140 in premiums. Of this amount the conspirators had collected $176,561.56 by the time the authorities caught up with them.

The damage did not end there. A few of the victims, because they did not have the State of Illinois statutorily required liability insurance on their vehicles they thought they had when they were involved in a traffic accident, had their driver's licenses suspended, despite the fact they believed they were covered and had actually paid for insurance coverage.[3] Others had claims that went unpaid,[4] with the result that some of the victims are still suffering the effects of unpaid claims, including medical bills and tarnished credit ratings.

On March 6, 1996, a grand jury returned a five-count indictment charging Gio, Goldstein, and Bonanno with executing a scheme to defraud involving the sale of fraudulent automobile insurance policies, in violation of the mail fraud statute, 18 U.S.C. § 1341. Each count charged the defendants based on a separate mailing in furtherance of the scheme. Count One charged the defendants with mail fraud for furthering their scheme by mailing a letter of solicitation to a prospective customer on May 10, 1993. Counts

Two, Three, Four and Five charged the defendants with mail fraud for furthering their scheme by mailing bogus insurance policies to customers on June 1, 1993, June 14, 1993, July 12, 1993 and August 25, 1993.

Gio signed a plea agreement, agreeing to plead guilty to one count of mail fraud, but Goldstein and Bonanno pled not guilty and went to trial. On August 5, 1996, the jury convicted Goldstein on all five counts and convicted Bonanno on Counts Two through Five. On August 12 and August 27, 1996, Goldstein and Bonanno filed motions in which they moved the court for new trials. These motions were denied.

Goldstein and Bonanno were sentenced on November 15. Pursuant to U.S.S.G. § 2F1.1(a) (applicable to crimes of fraud), the sentencing judge determined that the base offense level was six. Under U.S.S.G. § 2F1.1(b)(1), this base offense level is increased in relation to the amount of loss caused by the fraud. As far as calculating the "amount of loss," if the perpetrators of a fraud *attempted* to swindle more than what they actually obtained, the amount of loss is the amount that they *intended* to obtain, if the intended loss can in fact be ascertained.[5] U.S.S.G. § 2F1.1, Comment. n. 7. The sentencing judge found that the defendants had caused an actual loss of $176,551.56 but had *intended* that the victims suffer a loss of $622,140—the $622,140 being the value of the phony policies.[6] Under § 2F1.1(b)(1)(K), applicable to losses of more than $500,000 but less than $800,000, the court increased the offense level for each by ten.

---

3. The IDOI attempted to intervene for these victims to the Secretary of State's office, but to no avail.

4. Approximately thirty-nine policyholders filed claims. Investigators were able to locate only twenty of the thirty-nine; the claims of these twenty policyholders totaled approximately $57,000. When the conspirators were caught, they had only paid out two of the thirty-nine claims, paying a total of $7,000.

5. As § 2F1.1, Comment. n.8 explains, "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information...."

6. Actually, the district court found that *Goldstein* intended losses of $622,140; Bonanno's intended loss was a little less than this ($618,683). Noting that the jury found that Bonanno did not learn of the scheme's fraudulent nature until $60,457 in policies had been written, the trial court subtracted $60,457 from Bonanno's intended loss, but then added $57,000 representing unpaid claims to customers, making a total "intended loss" for Bonanno of $618,683. The $3,500 variance between Goldstein and Bonanno does not make a difference as far as our analysis, as both totals fall solidly within the parameters of § 2F1.1(b)(1)(K), which covers losses between $500,000 and $800,000.

At the same sentencing hearing, Bonanno argued that he should receive a two-level downward departure for acceptance of responsibility (pursuant to U.S.S.G. § 3E1.1), pointing out that shortly after his arrest he had confessed to the F.B.I. investigator that he had remained with the company even after he became aware of the fact that it was a fraud. The prosecution objected to Bonanno receiving this reduction. After hearing argument on the matter, the trial judge denied Bonanno's request for an "acceptance of responsibility" reduction.

Having decided on an offense level of eighteen,[7] which has a guideline range of twenty-seven to thirty-three months, the court sentenced both Goldstein and Bonanno to thirty months' imprisonment, with Goldstein serving concurrent terms on all five counts, and Bonanno serving concurrent terms on the four counts upon which he was convicted (Counts Two, Three, Four and Five). The judge also ordered both Goldstein and Bonanno to pay $3,000 in restitution, to be paid in monthly instalments, and stated that "[t]he monthly instalment amount should be at least $45." In his written order, he reduced the monthly instalment to $41 per month during the defendants' period of incarceration, and returned it to the $45 level per month after their release.

The trial judge also ordered the defendants to submit to drug testing during supervised release. At sentencing, he stated to Goldstein,

> You're not to possess any controlled substance illegally, you're to submit to one drug urinalysis within fifteen days after being placed on supervised release and two periodic drug tests thereafter as determined by the Probation Department—I'll make that two random drug tests thereafter—on a periodic basis—I think that's unclear as well.

> You're to submit to random drug testing at the discretion of the Probation Department. That will be the order on that. I know you can refrain from the possession and use of illegal drugs, and you'll just have to display that on a random basis throughout your supervised release period of three years.

Then turning to Bonanno, the trial court judge stated,

> You are not to possess illegally any controlled substance, and you're to submit to urinalysis within fifteen days of being placed on supervised release, and at random thereafter within the discretion of the probation officer.

In the written order for both, the sentencing judge ordered

> The defendant shall not possess any controlled substance. The defendant shall submit to one drug urinalysis within 15 days after being placed on supervision and random testing thereafter at the direction and discretion of the probation officer.

## II. ISSUES

This appeal addresses four issues: (1) whether the district court erred in calculating the amount of loss intended by defendants; (2) whether the district court erred by failing to specify the number of random drug tests to which the defendants must submit while on supervised release, instead leaving that to the discretion of the probation officer; (3) whether the district court erred by entering a written judgment which differed from the oral pronouncement of the judgment; and, (4) whether the district court erred by not allowing Bonanno a two-point reduction for acceptance of responsibility.

## III. DISCUSSION

### A. The district court's calculation of intended loss.

■ *Standard of Review.* A district court's calculation of the intended loss under

---

7. The record is not clear as to why the ultimate offense level was eighteen and not sixteen: all that the record reveals is that the base offense level was six, with an increase of ten owing to the amount of money at stake; the record does not reveal where the additional two points came from. Perhaps the additional points came from an enhancement for "a scheme to defraud more than one victim," pursuant to U.S.S.G. § 2F1.1(b)(2)(B) (we surmise this because the Probation Department recommended such an enhancement in the Presentence Report). In any event, the appellants do not challenge the additional two-point enhancement; therefore, we need not examine the issue.

U.S.S.G. § 2F1.1(b)(1) is a finding of fact reviewed for clear error, while its construction of the sentencing guidelines is reviewed *de novo. United States v. Purchess,* 107 F.3d 1261, 1265–66 (7th Cir.1997).

*Analysis.* U.S.S.G. § 2F1.1 provides the sentencing guidelines for crimes of fraud. Under § 2F1.1(a), the base offense level for fraud is six. If the loss exceeded $2,000, then the offense level is to be increased commensurate with the gravity of the scheme, following the table provided in § 2F1.1(b)(1), which states:

*If the loss exceeded $2,000, increase the offense level as follows:*

| | | |
|---|---|---|
| (A) | *$2,000 or less* | *no increase* |
| (B) | *More than $2,000* | *add 1* |
| (C) | *More than $5,000* | *add 2* |
| (D) | *More than $10,000* | *add 3* |
| (E) | *More than $20,000* | *add 4* |
| (F) | *More than $40,000* | *add 5* |
| (G) | *More than $70,000* | *add 6* |
| (H) | *More than $120,000* | *add 7* |
| (I) | *More than $200,000* | *add 8* |
| (J) | *More than $350,000* | *add 9* |
| (K) | *More than $500,000* | *add 10* |
| (L) | *More than $800,000* | *add 11* |
| (M) | *More than $1,500,000* | *add 12* |
| (N) | *More than $2,500,000* | *add 13* |
| (O) | *More than $5,000,000* | *add 14* |
| (P) | *More than $10,000,000* | *add 15* |
| (Q) | *More than $20,000,000* | *add 16* |
| (R) | *More than $40,000,000* | *add 17* |
| (S) | *More than $80,000,000* | *add 18* |

When calculating loss, the sentencing court is to use the perpetrator's "intended loss" rather than the actual loss if the former is greater: "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, Comment. n. 7.[8] In the case before us, the sentencing judge found that the conspirators' intended loss was indeed greater than the actual loss, noting that, on the day the IDOI closed down the scheme, the conspirators had only netted $176,561.56 but had sold policies obligating the victims to pay

$622,140 in premiums. Therefore, the sentencing judge found, the loss they intended to inflict amounted to $622,140.[9]

Goldstein and Bonanno challenge the judge's calculation. They claim that the $622,140 figure was "speculative" because they had only collected a fraction of that amount and, business realities being what they are, there was no way that all the customers would pay all of their premiums, even though they had promised to do so. Since the defendants knew all along that they would probably collect much less than the full $622,000, the defendants' argument goes, it is wrong to believe that they ever "intended" to collect the full amount. In fact, they say, there is *no way* of telling exactly how much of the $622,000 they would have collected; therefore, the "intended loss" cannot be determined, and (since "intended loss" can only be used if it can be "determined") "intended loss" cannot be used at all, meaning that the trial court should have had to use as its benchmark the "actual loss," or, $176,-561.56.

We disagree with the defendants' clever argument and hold it to be without merit. Contrary to the defendants' contention, "intended loss" is not the same thing as "probability of success." We explained this explicitly in our recent case of *United States v. Coffman,* 94 F.3d 330 (7th Cir.1996), but the defendants never analyze that case. As we held in that case, equating probability with intended loss "gives a twisted meaning to the word 'intended' and would, if accepted, irrationally erase any distinction in the severity of punishment between a defendant who tries to defraud his victim of $1,000 and a defendant who tries to defraud his victim of $1,000,000." *Id.* at 336.

When the guidelines speak of "intended loss," the relevant inquiry is not "How much would the defendants probably have

---

8. The guideline commentary that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of the guideline. *United States v. Rubin,* 999 F.2d 194, 197 (7th Cir.1993), citing *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

9. As explained in n. 6, *supra,* Bonanno's intended loss was $618,683. Because the difference is not material, however, for ease of analysis we use the figure $622,140.

gotten away with?", but, rather, "How many dollars did the culprits' scheme put at risk?" It is of little concern that the conspirators were able to collect only $176,000 before they were shut down. The crime was complete when the policies were sold. If intended loss is used as the benchmark, the probable success of the venture and what will happen in the future are irrelevant, as the future depends on factors that are beyond the defendant's control. *See, e.g., United States v. Yusufu,* 63 F.3d 505, 513 (7th Cir.1995) (where defendant deposited altered money orders and cashier's check totaling $90,000 but withdrew only $5,000, "[the defendant's] crime was complete before he withdrew the fraudulently represented cash. The money he made available to himself [$90,000] by way of depositing the fraudulent securities demonstrates the amount of loss [defendant] intended to cause"). *See also United States v. Strozier,* 981 F.2d 281, 283 (7th Cir.1992) (where defendant deposited bad checks totaling $405,000 into a bank account but withdrew only $36,000, intended loss was $405,000); U.S.S.G. § 2F1.1, Comment. n.7: "if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000." [10]

■ The defendants' argument has some merit when they claim that the guidelines permit a downward departure if the fraud perpetrated has an extremely low probability of success. There *is* a place for low probability of success in the guidelines; it just isn't the same place as intended loss. Application note 10 to section 2F1.1 of the guidelines authorizes a downward departure if a scheme was so ridiculous or impossible (i.e., had such a low probability of success) that it could not possibly deceive anyone. Obviously, this application note does not apply to the case before us, as people *were* victimized to the

tune of $622,140. And the fact that the guidelines allow this type of downward departure *outside the context of "intended loss"* shows that the guidelines intend "probability of success" to be treated separate and apart from intended loss. *See Coffman,* 94 F.3d at 337.

The face value of the policies reliably demonstrates the dollar figures at stake in the fraud, which is exactly what the letter and spirit of the "intended loss" language in the guidelines are all about. We thus affirm the finding of the district court regarding "intended loss."

**B. The district court's ordering of drug tests.**

The defendants next claim that the trial court unlawfully delegated to the probation officer the court's authority to determine the number of drug tests.

■ *Standard of Review.* We review questions of law relating to the imposition of sentence *de novo, United States v. McGee,* 981 F.2d 271, 273 (7th Cir.1992), and challenges to the district court's exercise of its discretionary authority for abuse of discretion. *United States v. Schechter,* 13 F.3d 1117, 1118 (7th Cir.1994).

■ *Analysis.* The court's authority to order drug tests is given to it in 18 U.S.C. § 3583(d), which states in relevant part that "The court shall also order as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance."

---

**10.** The defendants' argument about the "probable amount" of loss seems to contain a subtext, a complaint that the sentencing judge had done his best to peg the loss at as high a number as he possibly could. Even if this were relevant (which it is not), in our opinion the sentencing judge appears to have been lenient in finding "intended loss" to be $622,000. For one thing, television ads were still running and the conspirators were still taking orders when the IDOI

ordered that operations cease; there is nothing to indicate that the defendants intended to stop absent the order from the Illinois authorities. Moreover, Gio testified that the conspirators had hoped to make enough profits by the scheme that they would be able to start a legitimate insurance company. This would have required $2 million in capital. If the conspirators were to clear *profits* of $2 million, their fraud would have had to involve much more than $2 million.

The judge used his authority to order drug testing for Goldstein and Bonanno. At sentencing, he stated to Goldstein,

> You're not to possess any controlled substance illegally, you're to submit to one drug urinalysis within fifteen days after being placed on supervised release and two periodic drug tests thereafter as determined by the Probation Department—I'll make that two random drug tests thereafter—on a periodic basis—I think that's unclear as well.
>
> You're to submit to random drug testing at the discretion of the Probation Department. That will be the order on that. I know you can refrain from the possession and use of illegal drugs, and you'll just have to display that on a random basis throughout your supervised release period of three years.

Then turning to Bonanno, the judge stated,

> You are not to possess illegally any controlled substance, and you're to submit to urinalysis within fifteen days of being placed on supervised release, and at random thereafter within the discretion of the probation officer.

In the written order for both, the judge ordered

> The defendant shall not possess any controlled substance. The defendant shall submit to one drug urinalysis within 15 days after being placed on supervision and random testing thereafter at the direction and discretion of the probation officer.

Applying the reasoning of our holding in *United States v. Boula*, 997 F.2d 263 (7th Cir.1993), we are compelled to conclude that the district court went beyond the parameters of the statute and gave the probation office too much discretion for the management of the drug testing order. In *Boula*, the district court ordered that the defendants "pay Restitution in the amount of FIVE MILLION ($5,000,000) when released from custody in a manner to be suggested by the probation officer and when [they have] the capacity to do so." *Id.* at 269. We vacated the order because "the district court left too much discretion for the management of the restitution order in the hands of the probation department." *Id.*; *see also United*

*States v. Ahmad*, 2 F.3d 245, 248–49 (7th Cir.1993) ("Section 3663 does not permit a district judge to delegate to the administrative staff the specification of a payment schedule....").

Similarly, in the case before us, 18 U.S.C. § 3853(d) requires that *the court* determine the number of drug tests to which the defendants must submit. We therefore reverse the judge's decision on this issue and remand it, *see United States v. Mohammad*, 53 F.3d 1426, 1438 (7th Cir.1995) (an unlawful delegation requires that the order be vacated), in order that the judge may determine and direct the specific number of drug tests that Goldstein and Bonanno will be subject to while on supervised release.

## C. Discrepancies between the district court's oral and written orders.

The defendants' next claim is that the trial court, when crafting the written sentencing order, erred by departing from its oral pronouncement at sentencing in two ways: by including, in the written order but not in the oral pronouncement, a requirement that each defendant notify the United States Attorney of any change in name, residence or mailing address; and, by reducing the defendants' restitution in the written order from what it was in the oral pronouncement.

■ *Standard of Review.* We independently review the transcript of the sentencing hearing and compare it to the written order, determining as a matter of law whether such an error occurred. Our standard of review, therefore, is *de novo. See United States v. McGee*, 981 F.2d 271, 273 (7th Cir. 1992).

■ *Analysis.* "If an inconsistency exists between an oral and the later written sentence, the sentence pronounced from the bench controls." *United States v. Becker*, 36 F.3d 708, 711 (7th Cir.1994). However, " 'when an orally pronounced sentence is ambiguous the judgment and commitment order is evidence which may be used to determine the intended sentence.' " *United States v. Daddino*, 5 F.3d 262, 266 (7th Cir.1993),

quoting *United States v. Villano*, 816 F.2d 1448, 1451 (10th Cir.1987) (ellipses omitted).

■ As for the first alleged inconsistency, the oral pronouncement's omission of the requirement in the written judgment that each defendant notify the United States Attorney for the Northern District of Illinois of any change of name or address, it is true that the sentencing judge did not explicitly refer to this requirement in his oral pronouncement. However, he did order the defendants to comply with "all the standard conditions of supervised release adopted by this Court and the United States Sentencing Commission." The sentencing judge did not define the term "standard conditions," nor did the defendants request that he define or explain this ambiguous term. We can, though, as we stated above, turn to the written judgment to see if that helps us clear up this question. It does. The written judgment was prepared on a standardized form (AO 245 S (Rev.4/90)), and this form contained various, preprinted boilerplate provisions. The requirement to inform the United States Attorney of a name or address change is included on this standardized form; we hold, therefore, that the condition was part of the "standard conditions" ordered by the judge at sentencing.

■ The second alleged discrepancy is that, in the sentencing transcript, the judge ordered that the defendants, while in custody, make restitution of "at least $45" per month, utilizing the Inmate Financial Responsibility Program. In the written judgment, the judge ordered that the defendants, while in custody, pay restitution at only $41 per month.[11] It is difficult to divine why the defendants would challenge a discrepancy that worked in their favor; nevertheless, they did. If the defendants want to pay an extra $4 per month to align themselves with the oral pronouncement, we will follow through if they really desire it. We do not think they do, however, and we refuse to vacate the judge's order based on the defendants' complaint that their restitution obligation is $4 per month less than they thought it would be. Of course, considering that a

clear and unambiguous oral pronouncement must prevail over a written judgment, *Becker*, 36 F.3d at 711, our other option is to hold the defendants obligated to pay $45 a month both during supervised release and during the term of confinement, which would make the written judgment in accord with the oral pronouncement. In light of the trivial amounts at issue, and the fact that the prejudiced party (the State) has not moved for this, we decline to follow that route.

**D. Bonanno's acceptance of responsibility.**

The final issue is whether the district court improperly refused to grant Bonanno a two-level reduction in his sentence for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).

■ Standard of Review. The district court's acceptance of responsibility determination is a factual decision which we subject to clear error analysis. *United States v. Webb*, 110 F.3d 444, 446 (7th Cir.1997); *United States v. Corral–Ibarra*, 25 F.3d 430, 440 (7th Cir.1994). As we stated in *Corral–Ibarra*, "we will affirm the district court's finding if there is 'more than an adequate foundation in the record' to support the finding." *Id.* at 440 (citation omitted). *See also* U.S.S.G. § 3E1.1, Comment. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review").

■ *Analysis.* We refuse to conclude that the district court committed clear error in declining to grant Bonanno a downward departure for acceptance of responsibility. The central purpose of the acceptance of responsibility statute, which provides for a two-level reduction "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." (U.S.S.G. § 3E1.1(a)), is to "reward those who plead guilty-saving the judiciary and Government from the time,

---

11. Under the judge's written order, the defendants, after being released from prison, were to pay restitution at $45 per month.

expense and effort of trial—or who take 'some other equivalently concrete act, such as pretrial payment of full restitution.'" *United States v. Morgano*, 39 F.3d 1358, 1377–78 (7th Cir.1994), quoting *United States v. Gomez*, 24 F.3d 924, 926 (7th Cir.1994); *see also United States v. Beserra*, 967 F.2d 254, 255 (7th Cir.1992) ("A plea of guilty is (normally) a necessary, but is not a sufficient, condition" for the reduction); U.S.S.G. § 3E1.1, Comment. n.2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual items of guilty, is convicted, and only then admits guilt and expresses remorse"). "Post-conviction confessions imbue relatively no benefit on the criminal justice system and therefore are undeserving of the *quid pro quo* of decreased imprisonment." *Morgano*, 39 F.3d at 1378, citing *Beserra*, 967 F.2d at 256.

█ On the other hand, "[c]onviction by trial ... does not automatically preclude" application of the acceptance of responsibility adjustment. U.S.S.G. § 3E1.1, Comment. n.2, *quoted in United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir.1996). A defendant may go to trial "to assert and preserve issues that do not relate to factual guilt," such as constitutional challenges to the relevant statute or challenges to the applicability of a certain statute, and still be eligible for a § 3E1.1 reduction. *Id.*

Bonanno argues that his situation constitutes one of the rare occasions where the defendant can receive the acceptance of responsibility reduction even though he pleads not guilty. It is not even close. Bonanno, at trial, tested the factual claims of the indictment; he did not contest the constitutionality or applicability of the fraud statute. Because he did not "save the judiciary and Government from the time, expense and effort of trial," and because he expressed no remorse but centered his challenge around his guilt and not the applicability of the law, he has clearly failed to meet the burden of demonstrating a "rare situation" where a party pleads not guilty and yet warrants reduction.

Furthermore, Bonanno's actions during trial, including his effort to discredit the F.B.I. investigator's testimony, exhibit eva-

sion, rather than acceptance, of responsibility.

The five counts of the indictment charge that Bonanno knowingly participated in the fraudulent insurance scam on May 10 (Count One), June 1 (Count Two), June 14 (Count Three), July 12 (Count Four), and August 25, 1993 (Count Five). He did indeed admit, before trial, and at sentencing, that he knew about the fraud "in late June or early July." This means that he admitted the charges in Counts Four and Five but denied the charges in Counts One through Three. The jury, though, convicted him on Counts Two and Three. The fact that Bonanno denied some of the Government's charges but was convicted on them may also be taken into consideration in determining whether or not he is entitled to an "acceptance of responsibility" reduction. *See United States v. Velez*, 46 F.3d 688, 692–93 (7th Cir.1995) (a defendant who proceeded to trial on all charges, while expressing a willingness to plead to some but not all charges, does not merit a reduction under § 3E1.1). *See also Morgano*, 39 F.3d at 1378 (refraining from challenging some of the government's proof does not entitle a defendant to a reduction for acceptance of responsibility).

## IV. CONCLUSION

We remand this case to the trial court in order that the court may determine, pursuant to 18 U.S.C. § 3853(d), the number of drug tests to which Goldstein and Bonanno must submit while on supervised release. On all other issues, we AFFIRM.