**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 30 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAMES R. MILTON,

    Defendant - Appellant.

No. 00-2015
(D.C. No. CR-98-560-LH)
(D. New Mexico)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

---

Defendant/appellant James R. Milton was indicted on four counts including two counts of making a false or fraudulent statement to a department or agency of the United States in violation of 18 U.S.C. § 1001, and two counts of corruptly endeavoring to obstruct or impede the administration of the tax laws in violation of 26 U.S.C. § 7212(a). Defendant was convicted on all four charges and sentenced to eighteen months' imprisonment, *inter alia*. Milton now brings this appeal from the judgment and sentence.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# I

As a result of a divorce proceeding, a ranch belonging to Milton and his ex-wife was sold in 1981 against Milton's wishes. Mr. Milton's share of the proceeds was $358,620.87. The property allegedly had appreciated substantially during the time it was owned by the Miltons, and consequently the sale of the property resulted in a taxable capital gain to Mr. Milton. Milton did not report that gain; indeed, he did not file an income tax return at all for 1981. Some ten years later the IRS began investigating the proceeds Mr. Milton had received from the sale of the ranch in 1981.

After an investigation which was made considerably more difficult by Milton's refusal to cooperate, the IRS ultimately determined that Milton had failed to pay $65,000 in income tax on the gain from the sale of the ranch. With accumulated interest and penalties, the total owed was in excess of $300,000. The IRS formally notified Milton of its assessment of this liability in a letter which also informed him that he had 90 days to petition the Tax Court for relief. Milton took no action in response to the letter, and the IRS proceeded with efforts to collect the tax.

In September 1993, property which Milton had held in the name of the Spite and Malice Trust was sold at a foreclosure sale initiated by the IRS. It was about two weeks later, on October 9, 1993, when Milton sent mailings from Farmington, New Mexico to two IRS offices, one in Albuquerque, New Mexico and one in Ogden, Utah. In each

mailing Milton included a letter and a document which purported to be a "certified money order" in the amount of $605,131.52. The letter simply stated that payment in full for the assessed tax was enclosed, asked for the account to be credited, and asked for a receipt to be returned by mail. The letter to the Albuquerque office included a copy of a tax lien notice that had been recorded in San Juan County, New Mexico (the location of the property defendant had held in the name of the Spite and Malice Trust as referenced above). The letter to the Ogden office included a copy of the notice of tax assessment in the amount of some $337,000 which had been sent to defendant on August 24, 1992.

Although the "certified money orders" were designed to appear authentic, the IRS was not fooled. At Albuquerque, the person who opened the envelopes and first saw the document held a position described as an entry level job and had little if any experience or training. Nevertheless, something alerted this clerk so that the document was never put into the ordinary stream of checks and other payment instruments that the office received daily. The same thing happened in Ogden.[1]

These worthless documents had apparently been acquired from a tax protest group calling itself Family Farm Preservation, a group which in addition to providing form documents of this type also sold packets of materials which contend that the federal tax

[1]The clerks who opened defendant's mailings and first saw the purported money orders did not testify, so the record does not reveal why the money orders were not placed into the ordinary stream of payments. Thus, we do not know if it was something on the face of the fake money orders themselves or something in Mr. Milton's letter which prompted the clerks to set the documents aside for review by their superiors.

and monetary systems are invalid and unconstitutional.  Testimony at trial indicated that if the recipient of one of these "certified money orders" actually presented the instrument to the named drawee, "L. A. Pethahiah," they would receive a "certified banker's check" in return, and if the recipient tried to draw on that, it would be returned to them stamped "paid in full" without any actual payment or credit being given.  L. A. Pethahiah, a pseudonym for one of the persons behind the Family Farm Preservation group, had never been known to pay out money on any of the hundreds of money orders issued in his name.

In late February 1994, several months after the initial mailings, defendant sent a letter to the IRS referring to the "payment" sent in October and stating, *inter alia*, that:

> This is not a joke and it is not a game, however, you can say that you have been caught on the deadly game of fraud that you have been getting by with for so long.
> As a holder in due course, you may send the certified money order to the name and address for certified banker's check which will be promptly sent to you.  L.A. Pethahiah is not associated with any of the "federal banking associations" that have been guilty of perpetuating this fraud and rape of the American public.  Therefore, there is no routing number on the document.  If you lock it in your vault, you can count on it as good as if you had Federal Reserve Notes which are not redeemable by anyone for anything.  . . . .
> Don't bother to waste my time with any of your B.S. saying the Certified Money Orders are fake or fraud when they are as good or better than FRN's and are in fact equal consideration (or more) for FRN's credit – money created out of thin air.  . . . .

Aplt. Brief at 10.[2]

---

[2]Because the record does not include this letter, we quote here from defendant's brief.  Appellee's Answer Brief does not dispute the fact that this letter was sent to the IRS in February 1994.

As noted, Milton was convicted by a jury on all four counts charged against him. On appeal he raises two issues, one related to the conviction and one related to the sentence. First, he argues that the district court erred by refusing to instruct the jury on his theory of the case – that the fake money orders and accompanying letters were genuine protest efforts and so were protected by the First Amendment's Petition Clause. Second, he says that the district court erroneously increased the offense level used to derive the guidelines sentencing range when the judge relied on the concept of intended loss, rejecting Milton's argument that no enhancement was proper under Tenth Circuit precedent because no loss was possible.

## II

We review a district court's decision whether to give a particular jury instruction for abuse of discretion, but we review the instructions as a whole *de novo* "'to determine whether the instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.'" *United States v. Beers*, 189 F.3d 1297, 1300 (10th Cir. 1999) (quoting *Allen v. Minnstar, Inc.*, 97 F.3d 1365, 1368 (10th Cir. 1996)), *cert. denied*, 529 U.S. 1077 (2000). Generally, a defendant is entitled to an instruction on his theory of the case "'if the instruction is a correct statement of the law and if he has offered sufficient evidence for the jury to find in his favor.'" *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1262 (10th Cir. 1999) (quoting *United States v. McIntosh*, 124 F.3d 1330, 1337 (10th Cir. 1997)).

This is the text of defendant's requested instruction on the right to petition for redress of grievances:

> The First Amendment to the United States Constitution protects the right of individuals to petition the Internal Revenue Service of the U.S. government for redress of grievances and prohibits the imposition of criminal sanctions for petitioning activity.
>
> For you to find that Mr. Milton's actions in this case are protected by the First Amendment to the United States Constitution, you must find with respect to each count that the act of submitting a certified money order to the IRS was a genuine effort to procure a favorable governmental action and not a sham intended to obtain an unlawful result.
>
> A genuine effort to obtain a governmental result is protected even if it is attempted through improper means or because of malice or bad purpose such as the purpose of obstructing an IRS investigation.
>
> If you find that Mr. Milton's actions in this case were a genuine effort to procure favorable government action, then you should find him not guilty.
>
> The government must prove beyond a reasonable doubt that Mr. Milton's actions do not constitution [sic] petitioning the government for redress of grievances.

I R. Doc. 41, no. 5.

The government asserts that the defendant's proposed instruction is not a correct statement of the law, focusing on the breadth of the language in the third paragraph of the proposed instruction.[3] The district court, however, made it clear that it would be fruitless for defendant to attempt to amend his proposed instruction because the decision to refuse it was not due to a particular defect but because the judge was of the view that there was no way defendant's actions "could constitute freedom of speech . . . ." V R. 83. Under these

---

[3]It is undisputed that the Petition Clause pertains to administrative agencies such as the IRS. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the government.").

circumstances, we conclude that we must determine whether the district court erred in failing to instruct on the defendant's theory of the case, based on his Petition Clause theory, rather than focusing on the narrower question whether the particular language requested by the defendant correctly stated the law. We are not determining that Milton's requested instruction was a correct statement of the law.

The parties dispute whether there was evidence to support the defendant's theory, absent which the court would not be obliged to instruct on the theory. Over defendant's objections, the government was permitted to adduce evidence that Mr. Milton had carried on a lengthy dispute with the IRS and that he subscribed to theories regarding the supposed invalidity of the income tax laws and the federal reserve system. Defendant contends that this evidence of his long-standing disagreement with the IRS provided the requisite evidentiary support for his theory of defense. Nothing in this evidence, however, tended to indicate that the phony money orders, which were the subject of the charges against defendant, constituted an attempt to petition the IRS for relief. Instead the evidence, in our view, was only adequate to establish that Mr. Milton may have had a motive to present a petition to the IRS for relief. There was no evidence, however, from which the jury could have concluded that the bogus money orders were in fact petitions.

Defendant strenuously argues that the purported money orders – which he characterizes as the equivalent of a child's play money – were so obviously worthless that a reasonable jury could have inferred that defendant's motive in sending these documents

was merely to demonstrate his disagreement with his assessed tax liability and his desire to have the situation rectified. Appellant's Brief in Chief, p.26, argues that

> [s]een in the context of over ten years of Mr. Milton's submissions to the IRS, sending the certified money orders in this case was the equivalent of sending monopoly money to a creditor. It was and can be seen and interpreted only as a statement of dissent and disagreement. Such statements to the government are constitutionally protected petitions for redress of grievances. At least, a jury should decide whether they are or not.

Defendant also relies on the contention that the first persons to see the documents, employees of limited training and experience, recognized that the papers were of doubtful value. All of these arguments are insufficient to raise a submissible First Amendment issue.

In the first place, the purported money orders were patently designed to give the appearance of validity, unlike play money which is designed to be immediately discernible as something other than legal tender (to which it bears just enough resemblance to activate the imagination of a child). The phony money orders which defendant submitted are more closely analogous to counterfeit money. It could hardly be asserted that the Petition Clause would immunize a taxpayer who attempted to pay his taxes with counterfeit currency.

Defendant's argument seems to assume, implicitly, that *any* communication to an agency of the government should be presumed to be a petition protected under the First Amendment unless a jury concludes that it is a mere sham, in which case the argument that the communication was protected fails. It is clear that "speech is not protected by the

First Amendment when it is the very vehicle of the crime itself." *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) (same). In *United States v. Citrowske*, 951 F.2d 899, 901 (8th Cir. 1991), the court affirmed a conviction for knowingly and wilfully using a false writing or making a false statement to a government agency. More than fifty 1099 forms were filed by defendant falsely reporting a large amount of miscellaneous income to recipients. Defendant argued on appeal that the tax filings were protected protest speech. The Eighth Circuit rejected the argument, stating that "the magistrate judge correctly points out that the freedom of speech is not so absolute as to protect speech or conduct which otherwise violates or incites a violation of the tax law." *Id*. at 901.

We hold that the judge's refusal to instruct the jury on the basis of defendant Milton's requested charge on the Petition Clause was proper. There was no proof that Milton's actions "were a genuine effort to procure favorable government action," as his proffered charge suggests. The bogus instruments in evidence instead were "the very vehicle of the crime itself."

**III**

At sentencing, the district court increased defendant's offense level pursuant to U.S.S.G. § 2F1.1(b) based on an intended loss of $1.2 million; this was the basis for an

eleven point increase in the offense level.[4]  We note at the outset that neither party has objected to the application of this section of the Guidelines, either in the district court or on appeal.  Accordingly, our analysis is limited to that section.  We have not been asked to consider the possible application of U.S.S.G. § 2T1.1, (Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents),  and offer no comment on whether that section's use would have been proper, nor whether a different result might have been reached thereunder.

Milton contends that the district court erred because under our cases an enhancement for intended loss is not proper in cases where no loss was possible.  We so held in *United States v. Ensminger*, 174 F.3d 1143, 1145-47 (10th Cir. 1999), and *United States v. Galbraith*, 20 F.3d 1054, 1058-59 (10th Cir. 1994).  The holdings in those case were presaged by *United States v. Santiago*, 977 F.2d 517, 524 (10th Cir. 1992), in which we held that the intended loss could not exceed the amount of the possible loss.

It is unclear from our review of the record whether the district judge based his ruling on a finding of fact that there was a possible loss or on a conclusion of law that the amount of intended loss would control under U.S.S.G. § 2F1.1.  Because the judge adopted the findings and conclusions of the PSR, it appears that his decision may have been based on the latter reason.  In either event, the judge erred.

---

[4]The judge partially offset this increase by also ruling that the resulting offense level overstated the seriousness of the offense and by reducing the level by six.  Thus, the net offense level increase based on amount of intended loss was five.

The government argues that the district court was correct because a loss was possible in this case; that the IRS workers could actually have credited the amounts of the money orders to defendant's account. It seems obvious, however, that had such book entries been made, they could have been corrected when it became clear that the money orders were not valid. If this were not so, then it would seem to follow that any taxpayer who submits an ordinary check drawn on insufficient funds effectively stymies the IRS because it is somehow unable to correct initial book entries to reflect actual facts. Thus, to make this assumption – and the government in effect does ask us to make an assumption for there was no evidence on this point – would lead us to a preposterous conclusion. We find this argument unpersuasive and reject the contention that Milton had the capacity to inflict a $1.2 million loss on the government with the phony money orders. Thus, if the district court's decision is construed as a finding of fact that the defendant had the capacity to inflict this loss on the government, that finding is clearly erroneous.

The government cites *United States v. Lindsay*, 184 F.3d 1138 (10th Cir.), *cert. denied*, 528 U.S. 981 (1999), in support of its argument, contending that in that case the district court calculated the offense level using the face value of fraudulent checks and that the sentence was confirmed on appeal in this respect. We are not convinced for two reasons. In the first place, if *Lindsay* were actually contrary to *Ensminger* and *Galbraith*, we would be bound by the earlier cases. *See Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow

earlier, settled precedent over a subsequent deviation therefrom.")  Secondly, we do not view *Lindsay* as contrary to the earlier cases because this issue was not actually raised and decided in *Lindsay*.

In sum, we are bound by the *Ensminger* and *Galbraith* holdings when dealing with offense level increases under U.S.S.G. § 2F1.1, and such increases are improper where the defendant was incapable of inflicting the intended loss, as Milton was here.  Therefore, the case must be remanded to the district court for re-sentencing without the intended loss enhancement.

## IV

Accordingly the defendant's conviction is **AFFIRMED** and the case is **REMANDED** to the district court for imposition of a corrected sentence consistent with this opinion.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge